**Samuel CARROLL et al.**

v.

**SEARS, ROEBUCK & COMPANY**

**Civ. A. No. 77–0808.**

United States District Court,
W. D. Louisiana,
Shreveport Division.

April 20, 1981.

Randall S. Davidson, Kay Cowden Medlin, Blanchard Walker, O'Quin & Roberts, Shreveport, La., for plaintiffs.

Arthur R. Carmody Jr., John S. Odom Jr., Wilkinson & Carmody, Shreveport, La., for defendant.

## OPINION

STAGG, District Judge.

Plaintiffs Samuel Carroll and Charles W. Grant filed this Title VII class action on July 25, 1977, asserting an across-the-board attack on defendant Sears, Roebuck and Company's employment practices, which plaintiffs claim have a disparate impact upon black employees and applicants for employment.[1] Plaintiffs argue that Sears'

---

1. In their original complaint, plaintiffs also sought relief pursuant to 42 U.S.C. § 1981. However, the claims based upon § 1981 had prescribed and were dismissed on November 30, 1977.

discriminatory employment practices disadvantage blacks in the areas of hiring, training opportunities, promotion, compensation, and terminations. In addition, plaintiffs contend that Sears' testing procedures disparately affect black applicants for employment and promotion. Finally, plaintiffs allege that black employees at Sears have been victims of disparate treatment.

This court held a class certification hearing on July 6, 1979 and, in a ruling issued May 14, 1980, certified the following class:

> All present black employees of defendant Sears, Roebuck and Company's Shreveport facilities; all former black employees employed at defendant's Shreveport facilities on or after December 22, 1972; all future black employees of defendant's Shreveport store; and all unsuccessful black applicants who applied for employment at defendant's Shreveport facilities and were rejected on or after December 22, 1972.

Despite the repeated discovery disputes that hampered the progress of this litigation, the case finally proceeded to trial on January 12, 1981. After considering the testimony and exhibits introduced during the nine days of this trial, and reviewing the parties' post-trial briefs, the court enters the following findings of fact and conclusions of law.[2]

## I. STANDARD OF PROOF IN DISPARATE IMPACT CASES

■ This class action is based in part upon a disparate impact theory of discrimination. As the United States Supreme Court has noted, "claims that stress 'disparate impact' ... involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In a disparate impact case, the court's inquiry is whether plaintiffs proved a discriminatory *effect* resulting from defendant's employment practices. The Supreme Court has observed that "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups.... Congress directed the thrust of the Act to the *consequences* of employment practices not simply the motivation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (emphasis in original). Thus, proof of discriminatory intent is not required. *Id. International Brotherhood of Teamsters, supra.*

■ Initially, plaintiffs have the burden of establishing a *prima facie* case. They must first introduce evidence of a disparate impact upon a protected class, so as to create an inference that defendant's employment practices are discriminatory. *Griggs, supra; Albemarle Paper Company v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). If plaintiffs' evidence tends to support the existence of a disparate impact, the defendant will be given an opportunity to prove that plaintiffs' proof is inaccurate or unreliable, and as such fails to establish that a disparate impact, in fact, exists. In *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972), the Fifth Circuit noted that statistical evidence which shows an apparent disparate impact puts "on the employer the operational burden of demonstrating why, on acceptable reasons, the apparent disparity is not the real one." *Id.* at 358. "Thus, both parties are afforded a full opportunity to prove or disprove the existence of a substantial disparate impact indicative of discrimination, with the ultimate burden of proof regarding this prima facie showing on the plaintiff." Schlei and Grossman, *Employment Discrimination Law* at 1160 (1976) (hereinafter cited as

2. To avoid repetition, the court's findings of fact and conclusions of law will be combined in

discussing the various issues under consideration.

*Schlei and Grossman* ).[3] If defendant is unable to show that plaintiffs' initial proof of a disparate impact is unreliable, then plaintiffs will have successfully carried their burden of proving a *prima facie* case of discrimination. At that point, "the burden shifts to the defendant to prove that the substantial disparate impact is the result of a job-related selection device, a business necessity, a bona fide occupational qualification, or some other explanation which demonstrates that the substantial disparate impact is not the result of unlawful discrimination." *Id.* While defendant carries the burden of proving any of these affirmative defenses, the ultimate burden of persuasion is on the plaintiffs.

"[A] prima facie case of racial discrimination may be established by nothing more than valid statistical evidence of a significant discriminatory impact of defendant's practices ...." *Williams v. Tallahassee Motors, Inc.,* 607 F.2d 689, 691 (5th Cir. 1979); *United States v. Hayes International Corp.,* 456 F.2d 112, 120 (5th Cir. 1972). The courts have often placed heavy reliance upon statistical evidence, stemming in part from the Supreme Court's aforementioned statement in *Griggs* that Title VII focuses on "the *consequences* of employment practices." The courts have also placed heavy reliance upon statistical evidence because, as a practical matter, such evidence may provide "the only available avenue of proof", *United States v. Ironworkers, Local 86,* 443 F.2d 544, 551 (9th Cir. 1971), *cert. denied* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971), and because discrimination "will seldom be admitted by any employer." *Marquez v. Omaha District Sales Office,* 440 F.2d 1157, 1162 (8th Cir. 1971). *See generally Schlei and Grossman* at 1161–93.

Though statistical evidence is obviously useful, even essential, to plaintiffs' presentation, "the usefulness of such statistics varies with the surrounding facts and circumstances, which either support or undermine the inference of discrimination offered by the statistics." *Williams v. Tallahassee Motors, Inc., supra; International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 340, 97 S.Ct. at 1857; *United States v. Ironworkers, Local 86, supra,* 443 F.2d at 551. Statistics are not an appropriate method of proving a *prima facie* case unless "such statistics [are] relevant, material and meaningful and not segmented and particularized and fashioned to obtain a desired conclusion." *EEOC v. Datapoint Corp.,* 570 F.2d 1264, 1269 (5th Cir. 1968); *Robinson v. City of Dallas,* 514 F.2d 1271 (5th Cir. 1975).

In addition, the Fifth Circuit has warned that "undue emphasis" on the use of statistics "may obscure rather than advance the judicial process", *Hester v. Southern Railway Co.,* 497 F.2d 1374, 1381 (5th Cir. 1974) (footnote omitted), and that a court should avoid becoming involved in a "numbers game". *U. S. v. Hayes International Corp., supra,* 456 F.2d at 120. As the Second Circuit Court of Appeals has noted, "after all the technical statistical jargon like 'one tail' or 'two tail' tests and 'Chi-Square Test (Yates-corrected)' as well as the less esoteric numbers and percentages [are] placed before the trial judge, it [is] his job to resolve the issues." *Chance v. Board of Examiners,* 458 F.2d 1167, 1173 (2d Cir. 1972).

In this case, both parties relied upon statistical evidence which they assert either proves or disproves a discriminatory impact against blacks. Plaintiffs presented the testimony of a political and social scientist, Dr. Marvin Stottlemire. His testimony was

---

**3.** *Griggs* indicated that the burden shifts to defendants immediately upon plaintiff's showing of an adverse impact. However, subsequent cases have established this "intermediate step" in which defendant is given an opportunity to refute plaintiff's showing. *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters, supra,* 431 U.S. at 340, 97 S.Ct. at 1857 (employer argued that plaintiffs' statistics were misleading). *See* Note, *Business Necessity: Judicial Dualism and the Search for Adequate Standards,* 15 Ga.L. Rev. 376, 384 n. 38 (1981). The burden does not shift if defendant shows the invalidity or inaccuracy of the "adverse impact" plaintiff had demonstrated.

accompanied by several graphic exhibits. Defendant responded with the testimony and exhibits of Dr. Arnold Levine, an expert in the fields of applied and theoretical statistics and statistical computation. Plaintiffs contend that Dr. Stottlemire's presentation establishes that Sears' employment practices result in a disparate impact on blacks. Defendant argues that Dr. Levine's statistical presentation affirmatively disproves any allegations of discrimination. In addition, each party contends that the other employed improper methodology in preparing its statistical presentation.

## II. SEARS' SHREVEPORT FACILITIES AND AFFIRMATIVE ACTION PROGRAM

Before addressing the parties' statistical evidence, the court sets out the following findings of fact concerning Sears · and its Shreveport facilities. Sears, Roebuck and Company is a national chain of department stores and related facilities, with corporate headquarters in Chicago. During the last decade, the total number of Sears' employees ranged from 360,000 to 420,000. At the present time, there are about 375,000 Sears employees.

In the Sears hierarchy, five administrative areas, or territories, report to the corporate headquarters in Chicago. The territories are divided into zone offices, each of which reports to the appropriate territorial office. Forming the base of the Sears hierarchy are the various retail stores and related facilities. At a given store, certain officials report to the appropriate zone office, while others report to the territorial office.

· During the time period pertinent to this lawsuit, the Shreveport facilities were located in the Southwest Territory, which was headquartered in Dallas; Shreveport is also located within the Dallas zone. The Shreveport facilities consist of the Southern Avenue store, the Retail Distribution Center, the Central Service Unit, and the Southside store. Approximately 400 employees are currently employed at the Southern Avenue store, which also includes an automotive center; 70 to 100 persons are employed at the Retail Distribution Center; approximately 110 employees work at the Central Service Unit; and the Southside store has three or four employees.

A major part of Sears' defense of this lawsuit centered upon the existence of the corporation's national Affirmative Action Program, instituted in 1968. Various Sears witnesses, most notably Raymond Graham, established the following facts regarding the Affirmative Action Program:

1. In 1968, the top officers at Sears decided to institute a new department, the Equal Rights Department. Sears established this department to aid in compliance with civil rights legislation, including Title VII.

2. Within the new Equal Rights Department, a position known as the Director of Equal Opportunities was established. Sears officials selected Graham to fill this position because of his extensive experience in personnel with Sears, and because of his personal commitment to the civil rights movement. Graham understood that Sears' management decided to take a leadership role in providing opportunities for minorities. Graham then examined the law and recommended to top officers that a program be fashioned that would produce statistically significant showings of black representation and opportunities in Sears' work force. The 2,000 Sears facilities at that time were each required to fill out a questionnaire to facilitate the launching of the Affirmative Action Program.

3. Since its issuance in 1965, Executive Order 11246 has required government contractors to comply with a program for equal opportunities for minorities or to be excluded from doing business with the government. At the time Sears' Affirmative Action Program was being developed, the government had not yet stated any numerical goals for minority representation in an employer's work force. Later, a government regulation required compliance with Executive Order 11246· through use of numerical goals. While helping to develop the Sears Affirmative Action Program in 1968, Graham anticipated this regulation and

built numerical goals into the Sears Affirmative Action Plan. The goals devised by Graham were more stringent than those required by the government.

4. The General Services Administration (GSA) and the Office of Federal Contract Compliance Programs (OFCCP) are charged with overseeing compliance with Executive Order 11246. At the inception of the Affirmative Action Program, Sears *voluntarily* declared itself to be a governmental contractor, thus subjecting itself to monitoring by the GSA and the OFCCP. Since that time, the agencies have conducted 2,000 "reviews" or "audits" of Sears' facilities—none of which revealed noncompliance. The GSA performed at least two audits of the Sears Shreveport facilities, and neither indicated any serious problem of noncompliance.

5. After the Affirmative Action Program had been devised, store managers and management at all levels were bombarded with letters and other communications which advised them on the myriad details regarding proper compliance with the program. Management was instructed that they could not expect promotions if their employment records revealed that they had failed to comply adequately with the program.

6. Sears' Affirmative Action Plan establishes numerical percentage goals for minority representation in the work force at each Sears facility. These goals differ from one facility to another because the goals are based upon minority population in the applicable area. In addition, the plan establishes goals for minority representation in all job positions, not merely for the total percentage of hires.

7. One important aspect of Sears' Affirmative Action Plan is the "MAG" Program. MAG is an acronym for Mandatory Achievement of Goals, and requires that job vacancies be filled by minorities whenever minorities are underrepresented in that job position. This program is more stringent than that of any Sears' competitors and, in fact, is more stringent than governmental requirements. If no qualified minority applicant can be found to fill a vacancy in a position in which minorities are underrepresented, the Sears facility must get permission from its territorial office to hire or promote a white person into that vacancy. A facility's request to hire a white person into such a position is known as a "MAG deviation request".

8. In addition to the GSA or OFCCP reviews of the progress of the Affirmative Action Plan, and Graham's overall supervision for compliance, each territorial office has an equal opportunity head who reports to Graham. During much of the period at issue in this case, David Wood was the Southwest Territory equal opportunity head who supervised compliance within the Southwest Territory. Neither Wood nor any of his successors ever reported to Graham that the Shreveport facilities were in any way deficient.

9. Prior to giving his testimony in this case, Graham personally reviewed the overall results of the Affirmative Action Plan at the Shreveport facilities, and found that the facilities are in compliance with governmental requirements, though the stores are still striving to meet the more stringent goals of the Affirmative Action Program. Graham studied the facilities' progress in the same way he reviews "problem stores" that are called to his attention in Chicago. In Graham's opinion, the increase in black representation in Sears' Shreveport work force demonstrates that the Affirmative Action Plan has had "excellent" results. On May 26, 1977, the GSA issued a compliance letter regarding the Shreveport facilities; this letter indicates that a GSA review found that the facilities were in compliance with Executive Order 11246.

10. One important aspect of the Affirmative Action Program involves the recruiting of minority applicants for employment at Sears. When Esther Colbert Wilkins [4]

4. Ms. Wilkins is not a stranger to this court. In April of 1980, this court ruled after a three-day trial that Ms. Wilkins' allegations of sex discrimination against Sears were unfounded.

was Personnel Manager at Sears, she visited area trade schools seeking qualified black applicants, contacted high schools and took part in career days, arranged teas with local black leaders, placed ads in the area newspapers, and recruited black employees from competitors' stores. J. H. Hutchison, manager of the Southern Avenue store from May 1973 to June 1978, made presentations at Grambling State University and other area black schools with Ms. Wilkins and several department managers. Lyla Render, the current Sears Personnel Manager, has also taken part in such recruiting efforts as career days.

There are several relevant factors aside from the Affirmative Action Program which affect applicants for employment at Sears and the makeup of the Sears work force.

First, the Sears Personnel Department, which accepts applications for employment, is located within one mile of the State Employment Office. Persons who receive state unemployment benefits must at some point prove that they have been seeking work to continue receiving those benefits. Several witnesses, including Ms. Wilkins, whose testimony was generally unfavorable toward Sears, established that a significant number of blacks proceed from the State Employment Office to Sears' Personnel Department to apply for work. Thus, the close proximity of the State Employment Office to Sears' Personnel Department skews Sears' applicant flow to some extent.

Second, the turnover in the full-time work force at Sears' Shreveport facilities is very low. For example, among Sears' Shreveport sales force, the average full-time sales person has been with Sears for 14 years. Herb Wolfram, the Southern Avenue store manager after Hutchison's departure, testified that the Southern Avenue store has one of the lowest turnover rates of any Sears store with which he is familiar. Though Ms. Wilkins' testimony was highly critical of Sears' compliance with its Affirmative Action Program, she admitted being aware that it is difficult to meet the Affirmative Action goals in the face of such low turnover. As will be discussed *infra*, this low turnover plays a major role in the relatively lower representation of minorities in higher-level full-time positions.[5]

Third, there is no question that Sears' hiring and promotion policies and practices

*Esther Colbert Wilkins v. Sears, Roebuck and Co.*, C.A. No. 78–1148 (W.D.La.). Ms. Wilkins had filed those charges after her resignation from Sears in October of 1977.

It is clear to this court that Ms. Wilkins harbors strong feelings of animosity and resentment toward Sears, manifested in her testimony, during her own trial and during the trial of this case. Accordingly, her disparaging comments are given very little weight. Though Ms. Wilkins' testimony was often beneficial to plaintiffs, the court attaches little weight to comments made by a witness who "has an ax to grind".

5. Dr. Stottlemire suggests that plaintiffs' Exhibits 42A–F, 33 and 76, which contain information concerning hires and terminations, implicitly constitute evidence of turnover. Plaintiffs' Exhibit 49 shows an increasing labor force until 1977, followed by a decreasing labor force. In Dr. Stottlemire's opinion, these exhibits, when viewed together, demonstrate that even while the overall work force may remain the same, increase, or decrease, there are still a fair number of hires which indicate the existence of turnover at the Shreveport facilities. However, Dr. Stottlemire conceded on cross-examination that these exhibits do not distinguish between turnover of full-time and part-time employees. Ms. Render admitted that the turnover for new employees is relatively high when compared with that of all full-time employees. There is no question that Sears, like any other retail establishment, experiences turnover. The important factor is that the turnover among full-time employees and among employees in higher-level positions is very low, which would have an effect upon minority opportunities to fill those positions. It should also be noted that plaintiffs contend in their post-trial brief that low turnover is a "defense" which Sears has failed to prove. The court rejects this contention. First, Sears established the existence of low turnover to the court's satisfaction. Second, low turnover is not a defense, but is a fact of life in the Sears environment in the same way that the existence of the Affirmative Action Plan is a fact of life. Neither of these factors, in and of themselves, are "defenses" which operate as a bar to liability if proven. Rather, they are factors, among many others, which the court must consider in determining whether plaintiffs' evidence reveals any disparate impact upon blacks.

are in many respects highly subjective. One must consider Sears' hiring criteria in conjunction with its hiring practices and procedures. The Personnel Department at Sears is open six days per week, and hires from among the applicant flow to fill specific job vacancies. The department, and in particular the Personnel Manager, determines the need for new hires by keeping track of Sears' schedule hours, noting those areas where help is needed. The department also becomes aware of job openings when management advises of seasonal needs. If at any given time no positions are available, the department catalogs the applications submitted by "good" applicants and pulls those applications at a later date when positions come open. Ms. Render established that the personnel interviewers immediately begin to "size up" applicants, even if no jobs are open at the time they apply.

The hiring criteria or "qualifications" which a personnel interviewer seeks are very subjective for some job positions and less so for others. For example, when evaluating an applicant for a sales position, the applicant's appearance is of initial concern to the interviewer. As Ms. Render noted, an applicant's appearance is the first thing an interviewer sees and a sales person's appearance is the first thing a customer sees. Though satisfactory appearance is an important asset for a sales person, there is no question that "appearance" is a subjective hiring criterion.

Most of the other qualifications for sales positions at Sears are similarly subjective. If an applicant's appearance passes muster, the personnel interviewer will consider such attributes as articulateness, maturity, aggressiveness, and friendliness. Obviously, the ability to speak clearly and correctly is an important quality for a sales person. In regard to the "maturity" factor, as Ms. Render observed, a recent high school graduate would have little credibility with a housewife in giving advice about draperies. Aggressiveness is undoubtedly an important quality for a sales person. Finally, a sales person's friendliness not only makes customers more willing to deal with that sales person, but also enhances Sears' overall reputation as a pleasant place to shop. Thus, these hiring criteria for sales persons, like the hiring criterion concerning an applicant's appearance, are certainly appropriate factors for a retailer to consider in making hiring decisions. At the same time, these criteria are obviously subjective.

On the other hand, many of the qualifications for other job positions at Sears are quite objective. For example, experience is a desirable attribute for almost all jobs at Sears.[6] In addition, many of the job positions inherently require objective qualifications. The Sears' automotive department could not remain in business if it hired unqualified mechanics. The same is true for Sears' service department, which needs qualified electricians and repairmen. In fact, state law prohibits the hiring of electronic repair technicians not certified by the state.

Sears' promotion criteria are predominantly subjective. In the pretrial order, Sears stipulated that its criteria for promotion include fitness and demonstrated ability, employees' past work histories and abilities to produce, annual evaluations, and the opinions of supervisors. Sears maintains no written criteria or guidelines for promotion, and does not post notices concerning specific job openings or promotion opportunities. It is undisputed that a majority of the supervisors at Sears are white. Given the importance of supervisory ratings of employees and opinions concerning employees'

---

6. Ms. Wilkins testified that she often *sought* inexperienced applicants. The court rejects this testimony in favor of the more logical statement by Ms. Render that experienced applicants are usually more desirable. This is not to say that Sears will not hire applicants who lack experience. Many of Sears' witnesses stated that Sears will not hesitate to hire inexperienced applicants, who will then be trained to do a job "Sears' way". The point is that, given a choice between experienced applicants and inexperienced applicants, it is reasonable to expect that Sears will hire those with experience, all other things being equal.

work performance, black employees are clearly subjected to a greater risk of conscious or subconscious racial bias than are white employees.

The fact that Sears' hiring and promotion practices are subjective to some degree does not mean, however, that these practices are unlawful.[7] In *Hester v. Southern Railway Co.*, 497 F.2d 1474 (5th Cir. 1974), the Fifth Circuit held that subjective practices "are not violative of Title VII per se. Title VII comes into play *only when such practices result in discrimination.*" 497 F.2d at 1381

(emphasis added). Unless plaintiffs successfully prove that Sears' subjective practices result in a disparate impact upon blacks, the existence of those practices does not entitle plaintiffs to prevail under Title VII.

Finally, the court agrees with Sears' assessment that this case is distinguishable from the many reported decisions which concern allegations of discrimination against blacks and other minorities at large manufacturing plants.[8] Sears correctly

---

**7.** Plaintiffs contend that Sears' subjective hiring and promotion criteria are violative of long-established Fifth Circuit jurisprudence, particularly *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972), and *Bolton v. Murray Envelope Corp.*, 493 F.2d 191 (5th Cir. 1974). In *Rowe*, the Fifth Circuit recognized that subjective promotion procedures violate Title VII if, in their application, they produce a discriminatory disparate impact upon a protected class. There were five basic problems with General Motors' promotion criteria, which are very similar to Sears':

(1) "The single most important factor in the promotion process" was the recommendation of the employee's foreman;

(2) The foremen were given no written instructions indicating which qualifications were necessary for promotion;

(3) The controlling standards were vague and subjective;

(4) Employees were not notified of promotion opportunities nor of the qualifications necessary for promotion; and

(5) The promotion procedure did not include any safeguards which were "designed to avert discriminatory practices."

457 F.2d at 358–59. The Fifth Circuit held that a district court should scrutinize carefully such subjective promotion procedures.

All we do today is recognize that promotion ... procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready· mechanism for discrimination.... We and others have expressed a skepticism that black persons dependant directly on decisive recommendations from Whites can expect non-discriminatory action.

*Id.* at 359.

*Bolton* applied the *Rowe* rationale to hiring and initial job assignment decisions which are based upon subjective factors. 493 F.2d at 195. *See also James v. Stockham Valves*, 559 F.2d 310, 330 (5th Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). *Bolton* and *James* are pertinent to this case to the extent that Sears' hiring decisions are based upon subjective factors, but it should be noted

that the criteria applied by Sears, particularly with regard to mechanics and service technician's positions, is decidedly more objective and more reliant upon true qualifications than any of the practices employed in those cases.

**8.** Sears commented as follows in its pretrial brief:

Practically all of the Fifth Circuit cases cited and relied upon by plaintiffs [in their pretrial brief] dealt with manufacturing concerns which employed high percentages of laborers, operatives and craft workers. Most of them involved complaints of lack of promotion to supervisory positions, mandatory testing with score cut-offs below which one could not be promoted, administration of the Wonderlic and other now-condemned tests and strict plant seniority systems that predated the Act....

None of these cited cases dealt with a retail merchant, many of whose employees must meet and greet the general public who appear in its store as customers. None of the cited cases dealt with, for example, telephone solicitors or credit interviewers who deal with individual customers on a one-on-one basis and whose own personality, in many cases, makes a possible sale rather than the particular product. None of the cases dealt with repairmen who must enter the homes of the company's customers to work on appliances and other products. None of the cited cases dealt with companies having only a small percentage of its workforce comprised of laborers and service workers. None of the cited cases dealt with business operations that were subject to short-term, rapid increases in business due to seasonal cycles, nor did the cited cases involve businesses with a high percentage of part-time workers. None of the cited cases dealt with companies in which upper level managers were all appointed by a territorial office in another state, over which the local unit had absolutely no control. In short, Sears does not conduct a manufacturing business with high numbers of supervisors and a rigid seniority system. It is a retailer and its bottom line

highlights the fact that the general public is not presumptively qualified[9] for most of the job classifications at Sears, unlike the situation facing many manufacturers in which literally anyone in reasonably good health can perform assembly-line duties or other manual labor. This is true regardless of the fact that many of Sears' qualifications are measured by subjective criteria.

As the Supreme Court noted in *Griggs*, "Congress did not intend by Title VII ... to guarantee a job to every person regardless of qualifications." 401 U.S. at 403, 91 S.Ct. at 853. In view of this language, the Fifth Circuit has held that qualifications "are an employer's prerogative." *Rowe v. General Motors, supra*, 457 F.2d at 358. A retail employer such as Sears would be seriously disadvantaged if it were unable to use subjective hiring or promotion practices that are obviously job-related. As mentioned previously, however, the law does not absolutely impose this disadvantage, since subjective practices are not violative of Title VII unless they result in a disparate impact upon a protected class. Accordingly, the court will now consider the parties' statistical evidence to determine whether Sears' employment practices have produced a disparate impact upon blacks.

## III. THE STATISTICAL EVIDENCE

### (A) Hiring

Plaintiffs contend that Sears' subjective hiring policies result in a disparate impact upon black applicants for hire. In support of this contention, plaintiffs presented Exhibits 33 and 34–40, along with Dr. Stottlemire's testimony concerning those exhibits. The exhibits reveal that in every year from 1973 through 1979, more blacks than whites applied for employment at Sears, yet a greater percentage of the white applicants was hired in every year except 1975. In every year except 1975 and 1976, the total number of whites hired exceeded the total number of blacks hired, again despite the

relatively larger number of black applicants.

Dr. Stottlemire analyzed this data in order to determine whether Sears discriminates against black applicants by hiring disproportionately few of them. He concluded that the hiring data contained in plaintiff's Exhibit 33 warrants that inference. In reaching this conclusion, Dr. Stottlemire relied upon an assumption that qualifications are randomly distributed among black and whites, *i. e.*, that blacks and whites are equally likely to be qualified for each job. If one accepts this assumption, it follows that one would expect *equal percentages* of successful black applicants and successful white applicants. Exhibit 33 is based upon these principles, and reveals that the actual number of blacks hired in every year except 1975 was less than the "ideal" number of black hires.

Dr. Stottlemire's analysis is fraught with problems. First of all, the court accepts Dr. Levine's testimony that the black applicant pool is not appearing at random from the experienced labor force. Dr. Levine concluded that there is a significant statistical disparity between the percentage of black applicants and the percentage of experienced black workers in the area labor force. This disparity may be explained in large part by the close proximity of the State Employment Office to Sears' Personnel Department and by Sears' efforts pursuant to the Affirmative Action Program to recruit black employees. In addition, Ms. Render established that Sears' applicant flow includes a large influx of black applicants from the Job Corps, the O.I.C. and from various drug and alcohol rehabilitation programs. The evidence established that "most" of the applicants from the State Employment Office are black; "most" of the Job Corps and handicapped applicants are black; and all of the O.I.C. applicants are black. Obviously, all of the applicants

---

measure of a store's productivity and efficiency has been and always will be, ultimately, how much gross and net profit was produced.

Sears' Pretrial Brief at 21–23 (citations omitted).

**9.** *See* text at footnote 11, *infra*.

recruited pursuant to the Affirmative Action Program are black. The court concludes that these nonrandom factors result in an artificially high black applicant flow, such that use of that data for any purpose, and in particular for comparison with the percentage of white hires from white applicant flow, is unquestionably suspect.

On cross-examination, Dr. Stottlemire admitted that Sears' recruiting efforts and the close proximity of the State Employment Office, among other factors, could have the effect of inflating black applicant flow. However, given his assumption that qualifications are spread randomly throughout white and black employees, he stated his belief that it does not matter *why* applicants show up at the Sears Personnel Department since he would expect equal percentages of black and white applicants to be hired, regardless why those applicants actually applied.

This brings the court to the second major problem with Dr. Stottlemire's analysis. Plaintiffs offered no proof which would tend to show that Dr. Stottlemire's assumption regarding the random distribution of qualifications is accurate. In response to a question posed on cross-examination, Dr. Stottlemire gave no clear answer whether he thinks this assumption is valid for mechanics or other skilled operatives, stating

only that he is not a demographer. He simply assumes that if 20 of 100 whites are qualified to be mechanics, then 20 of 100 blacks are qualified for mechanics positions. But, *Dr. Stottlemire admitted that he has no basis for this assumption, and that it was merely made for use with his statistical model.* He further admitted that the introduction of specific job qualifications for specific job categories "may" have an effect on the assumption.

As discussed above, there is no question that most, though certainly not all, of the job categories at Sears do involve specific job qualifications, though these qualifications are in many cases subjective. The Fifth Circuit has decried the use of subjective factors where there is a demonstrated discriminatory impact upon a protected class,[10] but has never indicated that the subjective nature of a hiring criterion renders it any less a "qualification" for the job in question.[11] The United States Supreme Court has implicitly recognized that a particular job may require "special qualifications' unless "the job skill . . . involved [in that particular job] is one that many persons possess or can fairly readily acquire." *Hazelwood School District v. United States*, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977).[12]

---

**10.** *See* footnote 7, *supra*, and accompanying text.

**11.** In *Phillips v. Joint Legislative Comm.*, 637 F.2d 1014 (5th Cir. 1981), the Fifth Circuit noted that "subjective judgments are *suspect* as job qualifications when they are exercised by members of an all-white executive or supervisory staff." At p. 1026 n. 21 (emphasis added). This language does not mean that legitimate subjective qualifications do not exist. Rather, it indicates that subjective qualifications carry with them a high potential for abuse, so that a court should carefully scrutinize the results of an employer's use of subjective factors, particularly where an all-white executive or supervisory staff is concerned.

The Fifth Circuit specifically recognized in a recent case that subjective qualifications such as personality considerations may be acceptable for "certain selling situations." In *Robbins v. White-Wilson Medical Clinic, Inc.*, 642 F.2d 153 (5th Cir. 1981), the defendant contended that its decision not to hire plaintiff as a clerk

was based in part upon personality considerations. The court noted as follows:

Plaintiff does not specifically challenge the legitimacy of this qualification [(personality)]. We do not wish to suggest, however, any general endorsement of the proposition that Title VII claims can be defeated simply by asserting a preference for certain types of personality traits. Defendant's testimony would not support a finding that particular characteristics are essential to the effective performance of the clerk's duties, *as might be the case, for example, in certain selling situations.*

At p. 155 n. 2 (emphasis added). The court also cited the fact that the clerical employees in that case did not "deal with the public at all." *Id.* This court finds that the subjective consideration used by Sears in regard to job positions that deal with the public, particularly sales positions, are legitimate qualifications.

**12.** In this passage from *Hazelwood*, the Supreme Court referred to "the ability to drive a

It is clear that some of the positions at Sears do not involve special qualifications.[13] However, this court cannot conclude that retail sales positions and clerical positions require job skills which are so commonly available that the general population can be considered presumptively qualified for those positions, regardless of the fact that the qualifications are subjective.

Dr. Stottlemire admitted that his model would have to be adjusted to take into account the "qualified applicant pool" *if* Sears had "compelling data" showing that qualifications are *not* randomly distributed among blacks and whites. The problem with this reasoning is that Dr. Stottlemire would place upon Sears the burden of *disproving* the very assumption which is of critical importance to his analysis. Contrary to Dr. Stottlemire's suggestion, the burden is upon plaintiffs to establish a *prima facie* case by competent proof; this they cannot do by making a self-serving assumption which underlies their statistical presentation and for which no competent proof was adduced. As mentioned above, Dr. Stottlemire frankly admitted that he had no basis for his assumption. The court rejects this assumption for lack of supportive proof, and rejects plaintiffs' methodology insofar as it relies on applicant flow data that has not been adjusted in any way to take qualifications into account.

In *Fisher v. Proctor and Gamble Mfg. Co.*, 613 F.2d 527 (5th Cir. 1980), the Fifth Circuit indicated that "a prima facie case may be shown *without evidence of qualifications* where the inference of discrimination is supported by a *compelling level* of racial underrepresentation in a sizable work force." *Id.* at 544 (emphasis added). Under this principle, it is arguable that plaintiffs in an appropriate case need not take qualifications into account in proving a *prima facie* case of discrimination in hiring *if* they present "compelling" data that a defendant hires too few blacks. In this case, however, plaintiffs' own data reflects the relatively large percentage of black applicants hired by Sears during the relevant period. Plaintiffs' Exhibit 33 shows that 1,953 applicants were hired from 1973 to 1979. In a community in which the black population has ranged from 30 to 34 per cent during the relevant period, 885 of those hired, or 45.3 per cent, were black. It is also true that 8,779 of the 15,544 applicants during the period, or 56.5 per cent, were black, but the court has already found that the black applicant tally is artificially inflated by certain nonrandom factors, so a comparison between the percentage of black applicants and the percentage of successful black applicants is misleading. Plaintiffs' failure to present compelling evidence that Sears hires too few blacks renders the foregoing language from *Fisher* inapplicable. More importantly, plaintiffs' raw applicant flow data, unadjusted for qualifications, is of questionable probative value.[14]

The court agrees with Sears' assessment of Dr. Stottlemire's assumption that qualifications are randomly distributed among blacks and whites:

[The assumption] flies in the face of common knowledge and experience. The very reason for training programs for

truck" as an example of a job skill for which the general public is presumptively qualified. *A fortiori*, a truck driver position requires no "special qualifications".

13. Such as truck driver, truck helper, and porter position. "Porter" is Sears' term for janitors or other maintenance employees.

14. Plaintiffs presented the expert testimony of Dr. Kenneth Hintz, a specialist in demography, who stated that demographers would prefer applicant flow data to labor force data, citing D. Baldus and J. Cole, *Statistical Proof of Discrimination*, § 4.11 (1980). However, Dr. Hintz further testified that applicant flow data must be *adjusted* for any known deficiencies. Baldus and Cole have observed that "whenever qualifications are relevant under substantive law, an attempt should be made to account for differing qualification levels...." *Id.* at p. 109. Baldus and Cole also believe that "differing qualification levels can be taken into account much more easily with applicant flow data than any other kind of data." *Id. See also id.* at §§ 6.11, 6.21, 6.3 and 8.12. Plaintiffs made no attempt to adjust the applicant flow data for qualifications by any of the methods suggested by Baldus and Cole or by any other method.

minorities, and for affirmative action programs, is the recognition that for historical reasons blacks are not as qualified for all jobs as whites.

Sears' Posttrial Brief at 10–11. Several Supreme Court opinions support this position. In *United Steelworkers v. Weber*, 1443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Court discussed the history and purpose of Title VII:

> Congress' primary concern in enacting the prohibition against racial discrimination in Title VII . . . was with "the plight of the Negro in our economy." Before 1964, blacks were largely relegated to "unskilled and semi-skilled jobs". Because of automation the number of such jobs was rapidly decreasing. As a consequence "the relative position of the Negro worker [was] steadily worsening. In 1947 the non-white unemployment rate was only 64 per cent higher than the white rate; in 1962 it was 124 per cent higher." Congress considered this a serious social problem . . . . Congress feared that the goals of the Civil Rights Act— the integration of blacks into the mainstream of American society—could not be achieved unless this trend were reversed. And Congress recognized that would not be possible unless blacks were able to secure jobs "which have a future".

443 S.Ct. at 202 99 S.Ct. at 2727 (citations omitted). The Supreme Court earlier recognized that blacks are disadvantaged in competing for jobs because they "have long received inferior education in segregated schools". *Griggs v. Duke Power Co., supra*, 401 U.S. at 430, 91 S.Ct. at 853.

Thus, Congress enacted Title VII with an eye toward blacks' economic "plight" caused by historically inferior education and the historical relegation to unskilled or semi-skilled jobs. Sears has attempted to face this problem by recruiting large numbers of black applicants, which increases Sears' chances of finding qualified black employees so that the affirmative action goals may be met. Dr. Stottlemire's assumption of random distribution of qualifications is clearly unrealistic, aside from the fact that it was not proven.

In summary, the court finds that plaintiffs' statistical presentation contained in plaintiffs' Exhibits 33 and 34–40, fails to demonstrate the existence of a disparate impact upon black applicants for hire at Sears, and thus fails to establish a *prima facie* case of discrimination in hiring, for the following reasons:

(1) Plaintiffs' reliance upon raw applicant flow data is misplaced in the context of a work force wherein many job categories require "special qualifications". Generally, an attempt to utilize applicant flow data to prove discrimination in hiring is a sound approach: the Fifth Circuit has ruled that "the most direct route to proof of racial discrimination in hiring is proof of disparity between the percentage of blacks among those applying for a particular position and the percentage of blacks among those hired. . . ." *Hester v. Southern Railway Co., supra*, 497 F.2d at 1379. More recently, the Fifth Circuit observed that "actual" applicant flow data is "often the best measurement". *Phillips v. Joint Legislative Comm.*, at p. 1025 (5th Cir. Feb. 23, 1981). However, this data must be adjusted in appropriate circumstances to take special qualifications into account;[15] as one source observes, *Hester* "clearly supports the view that the plaintiff's statistics must focus on the *qualified* labor market." *Schlei and Grossman, supra*, at 1174 (emphasis added). Plaintiffs' failure to adjust the applicant flow data for qualifications renders that data unreliable as a basis for comparison, and the Fifth Circuit recognized in *Robinson v. Union Carbide Corp.*, 538 F.2d 652 (5th Cir. 1976) that a district court may reject statistical analyses which are based upon unreliable applicant flow data.

(2) Apparently, plaintiffs' only reason for failing to adjust the applicant flow data for qualifications was their trust in Dr. Stottlemire's assumption that qualifications are randomly distributed among blacks and

---

**15.** *See* footnote 14, *supra.*

whites. But plaintiffs offered no proof to establish the validity of this assumption, and Dr. Stottlemire admitted he had no basis for the assumption. Moreover, the assumption is unrealistic in that it fails to consider the historical disadvantages which past discrimination has visited upon blacks in our society. The effects of past discrimination certainly constitute a nonrandom factor that would have a profound influence upon the "random distribution" of qualifications among blacks and whites.

(3) The data contained in plaintiffs' Exhibit 33 reveals that 45.3 per cent of all persons hired from 1973 to 1979 were black, a figure which compares very favorably with the general population figures of 30 to 34 per cent during the pertinent period. This fact precludes any finding by the court that plaintiffs have demonstrated such a compelling underrepresentation of black hires that a *prima facie* case may be demonstrated without the necessity of any evidence of or adjustment for qualifications.

(4) Finally, the use of applicant flow data is particularly suspect because of the inflated numbers of black applicants. Dr. Stottlemire was untroubled by this factor only because of his assumption regarding random distribution of qualifications. Having rejected this assumption, the court questions the reliability of statistics based upon the skewed black applicant flow data. This factor, in combination with plaintiffs' failure to adjust the applicant flow data for qualifications, renders that data unreliable.

Sears pointed out these problems with Dr. Stottlemire's methodology and also submitted Dr. Levine's statistical presentation, which allegedly disproves any inference that Sears' employment practices result in a disparate impact against blacks. In his presentation, Dr. Levine has attempted to avoid Dr. Stottlemire's mistake of failing to take qualifications into account by comparing the composition of Sears' labor force with the labor force in the general area. The 1970 United States Census data, in conjunction with the 1975 updated material, contains information regarding racial representation in various EEO [16] job categories.

Table 1A shows the percentages of blacks in each EEO job category in the area labor force. The information in this table was extracted from the 1970 U.S. Census data. The "Totals" column adds Bossier Parish, Caddo Parish and Shreveport SMSA data to represent a weighted average of these areas so that no relevant area is excluded.

Table 1B compares the percentage of blacks in the area labor force, from Table 1A, with the percentage of blacks in the Sears labor force. The last column on Table 1B, the "1975 census update (Shreveport)" shows that the 1975 update figures are very comparable to the 1970 census data so that the passage of time evidently has not affected the validity of the 1970 data. Table 1B demonstrates the gains which blacks made in the Sears work force from 1973 to 1977. Black representation in the more "desirable" job categories increased significantly while black representation in the operatives, laborers and service categories, to which blacks have traditionally been relegated, actually decreased.

As Dr. Levine noted, Table 172 of the 1970 Census data shows that, at that time, the experienced labor force in this area was 28 per cent black. He concluded that a statistician would expect Sears' work force to be 28 per cent black "if everything is random", *i. e.*, if no discrimination is taking place. Plaintiffs' Exhibit 49 shows that Sears' work force has been in excess of 28 per cent black in every year except 1974, when blacks represented 26.8 per cent of the work force. Exhibit 49 also reveals the impressive increases in the percentage of black representation at Sears, undoubtedly due in part to the affirmative action program.

---

**16.** "EEO", or "EEO–1", job categories are seven general job categories which cover the specific job classifications at a store like Sears. The name is derived from the "EEO–1" report which Sears and other government contractors fill out so that their employment practices may be reviewed for compliance with the civil rights laws. The seven general EEO categories include the following: (1) officials and managers; (2) sales; (3) clerical; (4) craftsmen; (5) operatives; (6) laborers; and (7) service.

Tables 1F and 1G, and Figure 1G, reflect the principle that, in determining the number of "expected" black hires, it is not valid to compare the percentages of blacks at Sears to the percentages of blacks in the SMSA. Rather, one must assign appropriate weight to the occurrence of each job category in the SMSA in proportion to its occurrence in the Sears workforce. Dr. Levine assigned weights, or "Q values" to the SMSA figures, since the job structure at Sears is not the same as the job structure of the SMSA area in general. This procedure adjusts the labor force data to reflect the availability of jobs in the Sears labor force. According to Dr. Levine, this procedure yields the "hypothetical qualified people" in the area. Once the "Q calculation" is performed by year and by job category, it appears that blacks are *overrepresented* when one considers the Sears work force in comparison with the weighted SMSA work force.

In several exhibits which are relative not only to the issue of hiring, but also to the issue of job assignment which will be discussed *infra*, Dr. Levine has attempted to show that the actual number of black hires exceeds the expected number of black hires for all positions except laborers.[17] Table 2D shows that in 1977 more whites were hired into the laborer category than were expected. Defendant's Exhibit 45 shows a similar result in 1978 in the laborers' category, and in 1979 in the laborers and operatives categories. Based upon these exhibits, Dr. Levine concluded as follows:

(1) When one removes the laborers category from this data, the number of black hires exceeds the expected number of black hires in every year;

(2) The overrepresentation of white hires in the laborers' category can be explained by the strategy of the affirmative action plan to place more whites into traditionally black jobs.

On rebuttal, plaintiffs offered several objections to Dr. Levine's methodology. First, both Dr. Stottlemire and Dr. Kenneth Hintz[18] criticized Dr. Levine's usage of the 1970 census data because such data reflects the effect of institutional racism and past discrimination against blacks. On this point, Dr. Levine admitted that society-wide discrimination would undermine the usefulness of the 1970 census data; but he noted that there is much data indicating that the census information is, in fact, useful. More importantly, Dr. Levine observed that if one "fudge factors" the 1970 percentages upward to account for any effect of past discrimination, Sears would still meet those higher percentages since Sears' percentages are higher than those in the SMSA. Second, Dr. Stottlemire questioned Dr. Levine's assumption that the distribution of qualifications among applicants for employment at Sears will reflect SMSA percentages. However, in *Robinson v. Union Carbide Corp., supra*, the Fifth Circuit upheld a district court's utilization of area labor force data, noting that "on many occasions, federal courts have compared the composition of the company's work force to the composition of the labor force in the surrounding area." 538 F.2d at 658 (citations omitted).

Dr. Hintz raised a more serious objection to the use of the 1970 census data. In many of Dr. Levine's comparisons, such as those in Table 1B and Table 1C, the 1970 census figures are *frozen* while the Sears data is permitted to advance over time. Dr. Hintz observed that the advances one sees in the Sears labor force may have been occurring in the area labor force as well. Though this point is theoretically well-taken, Dr. Hintz admitted on cross-examination that he had no evidence that the black representation in the area labor force has increased from 1970 to 1980 as it has in the Sears labor force. In fact, Dr. Hintz acknowledged that the 1975 manpower update data contained in Table 2B appears to

---

17. *See* Table 2B, Figure 2B, Table 2C, Defendant's Exhibit 45, Table 2C(i), Table 2D and Table 2C(ii).

18. The court accepted Dr. Hintz as an expert in sociology with a specialty in demography. *See* footnote 14, *supra*.

show that in all but one EEO category black representation was decreasing from 1970 to 1975.

Finally, Dr. Hintz criticized Dr. Levine's hypothesis that the Sears applicants will mirror the SMSA data. According to Dr. Hintz, a demographer would prefer to utilize applicant flow data. However, as discussed previously, Dr. Hintz acknowledged that applicant flow data must be adjusted for any known deficiencies in order to be useful, yet plaintiffs failed to adjust the applicant flow data to take qualifications into account. Given the choice between unadjusted applicant flow data and Dr. Levine's assumptions concerning the use of area labor force data, the court chooses to accept the latter.[19]

The court has already noted the problems inherent in plaintiffs' statistical presentation, and has found that the presentation fails to establish a *prima facie* case of discrimination in hiring. Moreover, the court finds that Dr. Levine's statistical analysis reveals the impressive success of the affirmative action program in increasing black representation in the Sears work force. Not only did plaintiffs fail to prove their allegations of discrimination in hiring, but the totality of the evidence shows that, in fact, Sears' employment practices do not result in a disparate impact upon black applicants for hire.

### (B) Job Assignment

Sears allegedly discriminates against blacks in job assignment in two ways: first, by assigning a disproportionate number of black hires into part-time positions; second, by placing a disproportionate number of black hires into lower-paying, less prestigious job categories. In other words, plaintiffs contend that those blacks who manage to get hired are placed into less lucrative and/or less desirable jobs. These contentions will be considered separately.

### (1) Part-time placement

■ There are two categories of part-time employees at Sears: "part-time" employees and "part-time regular" employees. "Part-time" employees generally work less than 30 hours per week, except in rush seasons when they sometimes are required to work 40 hours per week. "Part-time regular" employees are part-time employees who have been on the Sears payroll for one year or longer. · Part-time and part-time regular employees who work 16 40-hour weeks are automatically promoted to full-time. Obviously, "full-time" employees are those who work 40 hours per week.

Raymond Graham, J. H. Hutchison, Herb Wolfram, Lyla Render and other Sears witnesses established the importance of part-time employees to a business which is primarily engaged in retail merchandising. The seasonal nature of retail sales dictates that more employees are needed in peak seasons, such as Christmas. Raymond Graham established that in some Sears facilities 50 to 60 per cent of the total annual work hours ours are performed by part-time employees.

In most cases, employees who perform the same job are paid the same wage. In addition to receiving less total pay because they work fewer hours, part-time and part-

**19.** Plaintiffs expressed one other criticism of Dr. Levine's methodology. Dr. Levine used Bossier Parish SMSA data in his exhibits despite the fact that there is a Sears store in Bossier City. The Bossier store is not involved in this lawsuit, but it is certainly possible that Bossier Parish residents may prefer to apply at the Bossier store if they wish to work for Sears. Dr. Levine answered this criticism by stating that he considers the Shreveport SMSA to be the "labor watershed" for Sears' Shreveport facilities. However, he included Bossier and Caddo Parish SMSA data out of an abundance of caution to make sure that he was covering the area from which the Shreveport facilities get their applicants. In any case, Table 1B shows that it makes very little difference whether one considers the Shreveport data alone or in conjunction with the other data, because the percentages are very similar. Thus, the court concurs in Dr. Levine's conclu-

time regular employees receive fewer benefits than full-time employees receive.[20]

Plaintiffs contend that Sears discriminates against blacks by placing a disproportionate number into part-time and part-time regular positions where they receive less total pay and fewer benefits. In support of this contention, plaintiffs presented Exhibits 41, 42A–F, 43–48, 50–55 and 56 along with the testimony of Dr. Stottlemire. Before discussing these exhibits, the court must set out the limitations of this inquiry.

First, J. H. Hutchison, the Southern Avenue store manager from May, 1973 through June, 1978 established that there were few full-time hires during his tenure at the store because of low turnover and the weak economy. Hutchison stated that "most" full-time employees were promoted to full-time from part-time positions. Herb Wolfram, the Southern Avenue store manager following Hutchison, was more precise about the extent to which full-time positions are filled through promotion from part-time: he estimated that 90 per cent of all full-time employees moved up from the part-time ranks.[21] With this factor in mind, it appears that very few newly-hired employees of either race, perhaps as low as 10 per cent of all full-time employees, are initially assigned into full-time positions. Thus, if blacks are underrepresented in full-time positions, that circumstance is more likely indicative of discriminatory promotion practices rather than discriminatory job assignment practices. Plaintiff's allegations of discrimination in promotions will be discussed *infra*.

Second, much of the statistical data presented by both parties involved part-time regular employees, as well as part-time employees. As noted above, part-time regular employees are merely part-time employees who have been on Sears' payroll in excess of one year. It is clear that no one, black or white, is *assigned* to a part-time regular position. Therefore, the part-time regular classification is irrelevant in regard to the issue of discrimination in job assignment.

Third, Sears' witnesses established conclusively that many, if not most, of the part-time employees, black and white, were initially assigned into part-time positions because they applied for those positions. Raymond Graham established that many applicants for employment at Sears seek part-time work. Some of the typical reasons why applicants desire part-time positions include the following: (1) some applicants have other jobs; (2) some applicants are housewives who want to supplement their family income; and (3) some applicants are college students. For one notable example, Ms. Render stated that *all* of the part-time porters presently employed at Sears sought part-time employment because they are holding down other jobs.

In summary, plaintiffs' persistent attempts to characterize part-time employees as unfortunate underlings in Sears' lowest caste are unrealistic in the sense that they fail to consider (1) the importance of part-time employees to a retail merchandising establishment, (2) the fact that the great majority of full-time employees were promoted to those positions from part-time po-

---

sion that the existence of a Bossier City Sears facility is of no consequence.

**20.** The parties stipulated in Section F(17) of the pretrial order that full-time, part-time regular and part-time employees receive the following benefits:

Sears maintains the following benefit program for full-time employees: Group life insurance; medical plan; short-time disability (illness) benefits; service allowance; vacation; employee discount; profit sharing and personal holidays. Part-time regular employees may be eligible for the following benefits, subject to special requirements: Group life

insurance; vacation; profit sharing; and legal holidays. They are eligible for employee discount. Part-time employees may be eligible for the following benefits, subject to special requirements: Vacation and legal holidays. They are eligible for employee discounts. Part-time regular and part-time employees are not eligible for any of the other benefits provided to full-time employees.

**21.** Ms. Render put the figure at 60% to 70%. The point remains that a significant majority of the full-time employees are not hired into those positions.

sitions, or (3) the fact that many of the part-time employees are initially assigned into those positions because they request them.

Plaintiffs' Exhibit 41 analyzes full-time and part-time hiring in light of the applicants' requests either for full-time or part-time positions. This data covers only April, 1978 through March, 1980 because the race of an applicant could not be determined from information contained on the application prior to this period.

Plaintiffs assumed for the purpose of this exhibit that persons who were hired part-time requested part-time positions, and that persons hired full-time requested full-time positions. This assumption is erroneous. On a Sears application form, an applicant may express a preference for either part-time or full-time work by checking an appropriately marked box. Ms. Render established that many applicants checked both the part-time and full-time boxes, while some applicants check neither. In fact, some of the class members who testified at this trial checked both boxes to indicate that they would consider accepting any available work. Even assuming for the sake of argument that this assumption does not affect the reliability of the data contained in Exhibit 41, the court finds that this exhibit does not demonstrate that black hires are discriminatorily assigned to part-time rather than full-time positions.

To begin with, this exhibit offers strong evidence of the effect of this country's weak economy during the two-year period covered by the data. During this two-year period, 4,031 out of 4,384 applicants for employment at Sears, fully 92 per cent of all applicants, were not hired. Although 70.6 per cent of all applicants requested full-time positions, only 2 per cent received full-time employment. More importantly, 79.3 per cent of all white applicants who were hired were assigned to part-time positions, and 85.3 per cent of the black hires received part-time assignments. On cross-examination, Dr. Stottlemire admitted that this is a small difference. In addition, there is very little difference between the per-

centage of black and white applicants who sought part-time work: 28.3 per cent of all black applicants requested part-time work, while 31.1 per cent of all white applicants requested part-time. Finally, Exhibit 41 shows that 57.5 per cent of all applicants hired were white; 42.5 per cent of the hires were black. Again, it should be noted that the 42.5 per cent black hires during this period well exceeds the 30–34 per cent black population in the general area.

Ms. Render and her staff at Sears made a study of all applications during the period covered by Exhibit 41 to determine the effect, if any, of further breaking down the applicant data to reflect those applicants who requested "both" part-time and full-time, and those applicants who requested neither. Ms. Render testified that 39.4 per cent of all black applicants sought part-time work, as opposed to 43 per cent of the white applicants. Her tabulation also showed that 79 per cent of all black hires were assigned part-time positions, while 76.8 per cent of all white hires were assigned part-time. Dr. Levine testified that there is no significant difference between Ms. Render's figures and those contained in plaintiffs' Exhibit 41. He concluded that, regardless which figures are used, the data reveals no significant disparity between part-time hires by race or applicants for part-time by race. The court accepts this conclusion.

Plaintiffs' other exhibits which deal with part-time placement are Exhibits 49, 50–55 and 56. Exhibit 49 demonstrates the numbers and percentages of whites and blacks employed in full-time, part-time and part-time regular positions for each year from 1974 through 1980. Dr. Stottlemire admitted that Exhibit 49 is "not very useful" because blacks are not compared to whites but to the entire work force as a whole. However, Dr. Stottlemire attempted to make the relevant comparisons, for example, black full-time to white full-time, in Exhibits 50–55.

The court agrees with Dr. Stottlemire's conclusion that Exhibit 49 is not useful as proof of discrimination in job assignment, but Exhibit 49 does offer powerful evidence

of the commendable success of Sears' Affirmative Action Program. The exhibit reveals the following changes in the numbers and percentages of black and white employees from 1974 to 1980:

White Full-time employees decreased from 332 to 241
% change: − 27.4%

White "Part-time Regular" employees decreased from 111 to 81
% change: − 27 %

White Part-time employees decreased from 58 to 49
% change: − 15.5%

Decrease in total white employees: 501 − 371 = 130
% DECREASE: 25.9%

Black Full-time employees increased from 92 to 117
% change: + 27.2%

Black Part-time Regular employees increased from 43 to 62
% change: + 44 %

Black Part-time employees decreased from 49 to 46
% change: − 6 %

Increase in total black employees: 184 to 225, 41
% INCREASE: 22.3%

Decrease in total work force: 685 − 596 = 89
% DECREASE: 13 %

Dr. Levine established that the 13 per cent decrease in Sears' total work force should trigger a concomitant decrease for each racial group if the process were racially neutral. Yet, the figures reveal a substantial decrease in white employees and a substantial increase in black employees. The court concurs in Dr. Levine's conclusion that Sears' Affirmative Action Program is the nonrandom factor which most likely explains the significant increase in black employees while the work force as a whole declines.

Plaintiffs' Exhibits 50–55 contain Dr. Stottlemire's comparisons between the numbers and percentages of black and white full-time, part-time regular and part-time employees for each year from 1974 through 1979 for selected job categories. However, these exhibits are of marginal utility in establishing plaintiffs' allegations of discrimination in assignments to part-time positions. First, hiring is but one element which affects these job compositions. For example, the court has already noted that the average employment period for full-time sales people at Sears is 14 years. These exhibits unquestionably take into account employees who were hired prior to

the effective date of Title VII. In addition, as discussed previously, Sears' traditional low turnover in full-time positions has a definite effect upon the numbers and percentages of both white and black full-time employees over the period covered by these exhibits. Thus, Dr. Stottlemire admitted that the entire history of the Sears work force is "rolled into" the various compositions of job classifications contained in these exhibits.

Though Exhibits 50–55 offer inconclusive evidence regarding placement of blacks into part-time positions, they, like Exhibit 49, reveal the striking gains made by black employees in certain categories. For example, the data concerning sales persons shows black representation increasing at a time when the total sales force was decreasing and the white sales force was decreasing dramatically. It is particularly noteworthy that black full-time sales persons increased by 40 per cent during the period, while white full-time sales persons decreased by 27.5 per cent.[22] Over the entire period, the total number of black sales persons increased very slightly (by two employees), while the total number of sales persons decreased by 25.4 per cent.

Finally, plaintiffs' Exhibit 56 reveals the percentages of full-time black employees in selected job categories. Unfortunately, this exhibit is subject to many of the same shortcomings as the previously-discussed exhibits. Like Exhibits 50–55, this exhibit contains data relating to the overall composition of several job classifications, which inherently involves the entire history of each job classification rather than simply the hiring element. Accordingly, the data contained in this exhibit does not conclusively indicate anything about initial assignment of blacks into full-time positions.

A more important problem with this exhibit is that Exhibit 56, in many job categories, deals with very small numbers; a

22. These percentages, particularly the 40% increase in black full-time sales persons, are not as dramatically different as they would appear. The 40% black increase actually reflects only an increase of 6 black full-time salespersons, from 15 to 21. Nevertheless, despite the small numbers involved, the point remains that black representation has increased while the white workforce was decreasing—unquestionably due in part to Sears' affirmative action efforts.

change of one or two employees could radically affect the percentages. For example, Exhibit 56 shows that, in 1977, 14.3 per cent of all full-time clerical employees were black. However, Ms. Render established that this percentage indicates only that one out of seven full-time clerical employees was black. Similar circumstances exist for several of the job categories contained in this exhibit. In this regard, the Fifth Circuit has recognized that statistical information which involves an extremely small universe is of questionable probative value in proving discrimination. *See, e. g., Ochoa v. Monsanto Company,* 473 F.2d 318 (5th Cir. 1973); *Rogillio v. Diamond Shamrock Chemical,* 446 F.Supp. 423, 428 (S.D.Tex. 1977).

For these reasons, the court finds that plaintiffs' Exhibits 41, 49, 50–55 and 56 are inconclusive and fail to establish that blacks are disproportionately assigned into part-time positions.

(2) Placement into "lower status" job categories

■ In support of their contention that Sears discriminates against blacks by placing a disproportionate number of black hires into lower-paying, less-prestigious job categories, plaintiffs introduced Exhibits 42A–F. These exhibits purport to show the numbers of whites and blacks hired into specific job classifications from 1974 through 1979.

Based upon these exhibits, Dr. Stottlemire concluded that there is an association between the type of job a person receives and his race. Plaintiffs contended in their pretrial memorandum that the exhibits illustrate "the disproportionate assignment of black hires to lower status jobs." Plaintiffs' Pretrial Memorandum at 17. The court finds these exhibits fatally defective in several respects:

(a) Dr. Stottlemire admitted that the figures contained in these exhibits do not guarantee that the people shown in each position were *hired into* that position. Rather, the exhibits reflect the positions held at the end of a given year by employees who were hired during that year. For example, if a person was hired in early 1974 as a sales person, but was later transferred to a clerical position and remained in that position until the end of 1974, Exhibit 42A would carry that person as a clerical hire despite the fact that he was initially assigned to a sales position.

In addition, Dr. Stottlemire testified that Exhibit 42 reflects *only* those employees who were hired during a given year and remained on the payroll at the end of that year. Thus, if someone was hired in January of 1974 and was fired or quit in February of the same year, he would not appear on Exhibit 42A within the category to which he was assigned.

Furthermore, a comparison of Exhibits 42A–F with Exhibit 33 shows contradictory hiring figures for each year. For the year 1978, the differences are quite substantial: Exhibit 33 shows that 183 whites and 133 blacks were hired, while Exhibit 42E reflects that 148 whites and 104 blacks were hired.

(b) Aside from the inaccuracy of the figures contained in Exhibits 42A–F, Dr. Stottlemire's conclusions concerning these exhibits were based in part upon his aforementioned assumption, rejected by this court, that job qualifications are randomly distributed among blacks and whites. Dr. Stottlemire employed this assumption in conjunction with Exhibits 42A–F, explaining that he does not necessarily believe that blacks should be equally represented in all positions, but that there is an association between a person's race and his job assignment. Dr. Stottlemire also concluded that a disparate number of whites were hired into the service technician categories. Not only does the court disagree with this specific conclusion,[23] but to the extent that it

---

**23.** Exhibits 42A–F show that from 1974 through 1979, 21 whites and 5 blacks were hired into service technician categories (service technician, service technician beginner, and service technician helper). The small numbers involved do not definitely indicate that the 80.8%/19.2% disparity is significant. More importantly, many witnesses, including Ms.

and Dr. Stottlemire's other conclusions are based upon his rejected assumption of random distribution of qualifications, those conclusions must also be rejected.

(c) A fundamental problem with Exhibits 42A–F is that no definitive indication is given concerning which job categories should be considered the "lower status jobs". These exhibits give no information concerning the various rates of pay which each job category commands. While the court is willing to assume that the "tire installer" category is a "lower status" position than the mechanic category, a comparison of the raw numbers of blacks and whites hired into each category is fruitless, because that comparison ignores the qualifications necessary for one to be hired as a mechanic.

Several random comparisons would *appear* to support a position that black employees are often favored in their placement into higher-level positions. For example, assuming that the "snack bar" is the same facility as the "coffee house" within the Sears Southern Avenue store, one would assume that the "snack bar attendant" classification is a lower status job than the "assistant coffee house manager" classification. The 1974 hiring data contained in Exhibit 42A shows that 85.7 per cent of those hired into the lower snack bar *attendant* classification were white, while 66.7 per cent of those hired as assistant coffee house *managers* were black. This comparison would be extremely misleading due to the very small numbers involved. The point is two-fold: first, the court is unsure which categories to compare in order to determine whether discriminatory job assignment exists; second, the small numbers of hires into most job categories render the percentages and any comparisons based upon those numbers highly suspect. *Ochoa v. Monsanto Company, supra.*

Wilkins, testified that the service technician categories constitute one area in which Sears has experienced difficulty in finding qualified black applicants. Accordingly, the court cannot agree with Dr. Stottlemire's conclusion that

Accordingly, the court finds that Exhibits 42A–F are unreliable for any purpose, and in any case do not support plaintiffs' allegations that Sears assigns disparate numbers of black hires into lower-status job categories. The most probative evidence regarding this issue is Dr. Levine's previously-discussed data, which shows that the actual number of black hires into each EEO job category except "laborers" exceeds the expected number of black hires into those categories. Dr. Levine's presentation proves affirmatively that Sears' hiring practices do not result in disparate assignments into lower status classifications.

(C) Promotions

■ As discussed above, Sears' promotion policies and practices are highly subjective and must be carefully scrutinized. *Rowe v. General Motors Corp., supra.*[24] However, the court has also noted that Sears' subjective promotion practices do not in and of themselves violate Title VII. Plaintiffs must first prove that the promotion practices result in a disparate impact upon black candidates for promotion. *Hester v. Southern Railway Co., supra.*

In an attempt to demonstrate the existence of a disparate impact against black candidates for promotion, plaintiffs introduced Exhibits 43–57. These exhibits reflect comparisons within Sears' internal work force. Sears' exhibits concerning this issue compare the percentages of black employees within the various EEO categories with the SMSA "qualified" labor force. Plaintiffs contend in their post-trial brief that the recent case of *Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419 (5th Cir. 1980) supports the validity of the comparisons made in their exhibits.

In *Johnson,* the Fifth Circuit addressed this issue as follows:

The dispositive issue is whether [Sears] ordinarily employs individuals for upper-

this data shows disparate numbers of whites being hired into the service technician classifications.

24. *See* footnote 7, *supra.*

level positions by hiring laterally from outside the company or by promoting from within. If it hires laterally, the relevant comparison is to the general or qualified outside labor force. If [Sears] fills jobs by promotion, the relevant comparison, as we recognized in *James v. Stockham Valves*, 559 F.2d 310, 331, 341 (5th Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978), is the company's internal work force.... The applicability of *James* in any given case turns on whether vacancies in non-entry level positions are or could be filled by promotion. If the vacant positions ordinarily are filled by lateral hires or hiring from among graduates of relevant educational programs, then the rigid *James* rule is inapplicable....

The difficulty is that most cases fall between these extremes of exclusive promotion and of exclusive nonpromotion. As a general matter, however, cases are dealt with in terms of the extreme to which they most closely accord.

628 F.2d at 425 (some citations omitted). In this case, the parties stipulated that Sears' policy is to promote from within its own labor force.[25] Raymond Graham testified that Sears adopted this policy because it enhances employee morale and is less risky than lateral hiring since Sears promotes individuals with whom it is already familiar. Thus, under *Johnson* and *James*, it is clear that plaintiffs' exhibits reflect the proper comparisons.

The next inquiry is whether those exhibits tend to prove the existence of a disparate impact upon black candidates for promotion. Before undertaking this inquiry, it may be helpful to set out the general scheme of promotions at Sears. Ms. Render explained that promotions at Sears are *normally* made within EEO categories. For example, a typical sales person may progress through the ranks at Sears in the following order:

(1) Part-time sales person;

(2) Full-time sales person;

(3) "Big ticket" sales person (many big ticket sales persons are content to remain in this position);

(4) Division manager;

(5) Merchandise manager;

(6) Higher levels, e. g., store manager. employee might progress in this fashion:

(1) Part-time clerical;

(2) Full-time clerical;

(3) Assistant credit sales manager;

(4) Credit sales manager;[26]

(5) Higher levels, e. g., store manager.

Although these examples demonstrate how a given employee may progress within the Sears work force, they do not represent the only avenues of advancement. Indeed, the parties stipulated in the Pretrial Order that Sears "routinely transfers employees to different departments" within the Shreveport facilities. Ms. Render admitted that it is not unusual for employees to advance from one EEO category to another. Nevertheless, the court accepts Ms. Render's testimony that promotion within EEO categories is Sears' "normal" practice.

With this practice in mind, it is clear that plaintiffs' statistical exhibits only marginally reveal information relating to advancement from one job level to another. The first of plaintiffs' "promotion Exhibits", Exhibits 43–48, do not break down the various job categories by full-time, part-time regular and part-time percentages. Thus, these exhibits offer no evidence of discrimination in promotions from part-time positions to full-time positions within the represented job categories.

Dr. Stottlemire expressed concern that black representation in certain job categories varies from zero per cent (service technicians in 1978) to 100 per cent (porters in 1979). This observation, however, has nothing whatsoever to do with the question

---

25. *See* Section F(15) of the Pretrial Order.

26. Ms. Render established that only one vacancy in the credit sales manager position has become available during her tenure thus far as Personnel Manager. She filled the vacancy with a black employee.

whether Sears discriminates against black candidates for promotion. Exhibits 43–48 simply reflect the percentages of black and white employees in given job categories for particular years. Furthermore, as Dr. Levine noted, Exhibits 43–48 show an increase in black representation during this period in almost all job categories, with the notable exception of such apparently "lower status. jobs" as tire installer, warehouseman, and stock clerk.

It should also be noted that promotion is but one element which affects the compositions of the various job categories depicted in Exhibits 43–48. New hires, retirements, resignations, terminations and transfers certainly affect the composition in any given year of a particular job category. More importantly, these exhibits also include employees whom Sears hired prior to the effective date of Title VII. For all of these reasons, the court concludes that Exhibits 43–48 are feeble evidence of discrimination in promotions.

Plaintiffs' next exhibit concerning promotions, Exhibit 49, is extremely pertinent to this issue to the extent that it contains evidence of black and white advancement from part-time positions into full-time positions. From 1974 to 1980, the number of black full-time employees increased 27.2 per cent while the number of white full-time employees was decreasing by 27.4 per cent and the *total full-time* work force was decreasing by 15.6 per cent. Over this period the total number of full-time positions decreased from 424 to 358, a total of 66; yet the number of black full-time employees *increased* by 25, from 92 to 117. This is evidence of Sears' deliberate attempt, through its Affirmative Action Program, to place more blacks into higher-level positions. In addition, the relationship between the percentages of all black employees at Sears and black full-time employees has remained fairly constant. In 1974, 26.8 per cent of Sears' work force was black, with 21.7 per cent of those black employees

working full-time. In 1980, 37.8 per cent of Sears' work force was black, and 32.7 per cent worked full-time. This demonstrates that the increasing black work force at Sears has been accompanied by a corresponding increase in black full-time employees.

Exhibit 49 does reveal the existence of a disparity between the percentages of black part-time employees and black full-time employees for each year.[27] This court is of the opinion that the disparity is *de minimis*, and in any case does not reveal the existence of discrimination in promotions, for several reasons.

First, the percentages of full-time black employees increased each year from 1974 to 1979, and fell off only slightly in 1980. As mentioned previously, this occurred during a time when the numbers of white full-time employees dropped off dramatically and the overall full-time work force declined. These factors contraindicate any inference of discrimination in promotions.

Second, the comparison between the percentages of black part-time and part-time regular employees on the one hand, as representing employees in "lower-level" positions, and the percentages of black full-time employees on the other, as representing employees in "upper-level" positions, is fundamentally suspect. Such comparisons between lower-level and higher-level positions make more sense in cases involving manufacturing plants where the lower-level positions generally involve lower pay and frequently involve more onerous working conditions than the higher-level positions. In this case, unlike the situation at manufacturing plants, a significant number of part-time and part-time regular employees hold "lower" positions because they *want* to hold those positions. The court has already discussed the fact that many housewives, college students and persons holding other jobs apply for work at Sears specifically seeking part-time jobs. These employees are not candidates for promotion to full-

**27.** *See* "Appendix A". This chart shows that throughout the pertinent period greater percentages of blacks appear in part-time and part-time regular positions than in full-time positions.

time positions, unlike the employees at manufacturing plants who, presumably, are all willing candidates for promotion. In addition, a part-time or part-time regular position within any job category is no more onerous a job than a full-time position within the same category.

Finally, the historic low turnover among full-time employees at Sears unquestionably plays a major role in limiting the full-time openings into which black employees may advance. In light of this low turnover, it appears all the more remarkable that the percentage of black full-time employees has significantly increased while the overall full-time work force was decreasing.

This court is left only to do what the Fifth Circuit jurisprudence mandates: accept the available figures, allow for imperfections, and take the figures for what they are worth.[28] Under the circumstances, the court concludes that the disparity shown by the figures contained in Exhibit 49 is not the sort of "substantial" disparity that gives rise to an inference of discrimination.

Plaintiffs' Exhibits 50–55 cure the main problem presented by Exhibits 43–48: they include breakdowns of full-time, part-time regular and part-time employees within various job categories. However, they also present several fundamental problems.

The main problem with these exhibits, as with Exhibits 43–48, is their failure to indicate which job categories constitute "lower-level" positions and which constitute "higher-level" positions. In *Johnson*, the Fifth Circuit compared black representation at each job level in the Uncle Ben's work force to determine whether "the proportion of [blacks] in each job grade . . . reflect[ed] the proportion of blacks available for promotion from lower job levels." 628 F.2d at 423 (footnote omitted). In this case, plaintiffs failed to introduce evidence concerning

any promotion levels such as those suggested by Ms. Render for sales persons or clerical employees. The figures contained in Exhibits 50–55 are a mishmash, which the court has scrutinized carefully for information that could lead to an inference of discrimination. Rather than finding such information, however, the court finds more evidence of the success of Sears' affirmative action program.

Dr. Stottlemire admitted that Exhibits 50–55 show a net increase in the number of black full-time sales persons. There is no question that sales person, in addition to representing the largest number of employees at Sears, are the backbone of Sears' retail merchandising business. It is, therefore, particularly significant that blacks have made great strides in their representation in full-time sales positions. From 1974 through 1979, white full-time sales persons decreased from 127 to 92, a 28 per cent decline. Over the same period, black full-time sales persons increased from 15 to 21, a 40 per cent increase. Despite the relatively small number of black full-time sales persons, and the fact that they remain greatly outnumbered by white full-time sales persons, it is difficult for this court to infer that Sears' promotion practices result in a disparate impact upon blacks during a time when blacks continue to advance while the rest of the work force declines. As mentioned previously, the average full-time sales person at Sears has been with the company for 14 years. With the historic low turnover at Sears' Shreveport facilities, it will be some time before the percentage of black full-time sales persons equals that of black part-time sales persons. Nevertheless, Sears' Affirmative Action Program evidently continues to facilitate progress toward that goal.

Plaintiffs' final exhibit[29] concerning alleged discrimination in promotions is Exhib-

---

28. *Phillips v. Joint Legislative Comm., supra,* slip op. at 3973.

29. Plaintiffs submitted one other exhibit concerning their allegations of discrimination in promotions. Plaintiffs' Exhibit 56 contains much of the data shown on Exhibits 50–55 and, unsurprisingly, suffers from some of the same

problems as those exhibits. As discussed previously, some of the percentages contained in this exhibit involve very small numbers of employees, such that the percentages could radically change with small numerical increases. In discussing this exhibit, Dr. Stottlemire espoused a rather novel theory: he testified that

it 57. This exhibit reveals that Sears' Shreveport facilities have never had a black checklist employee. When confronted with this fact on cross-examination, Raymond Graham testified that at the inception of Sears' Affirmative Action Program, there were only 15 black checklist employees in all of Sears. Now, there are 900. Graham felt that this represents a "great improvement"; however, since there are more than 2,000 Sears stores, Graham stated that he is not surprised to find a store with no black checklist employees.

Aside from the fact that the regrettable absence of black checklist employees at Sears is unsurprising, Sears' witnesses established that selection and placement of checklist employees originates at the territorial level, not locally. In their post-trial memorandum, plaintiffs question the relevance of this fact. To the extent that this lawsuit is based upon plaintiffs' allegations that Sears' local employment practices have resulted in a disparate impact upon blacks, the fact that checklist positions are not filled locally by promotions absolves the "local" Sears of liability for possible discriminatory promotion policies practiced at the territorial level. Any promotion practices carried on at the Southwest Territorial Offices are unknown to this court and are outside the scope of this lawsuit.

For the foregoing reasons, this court finds that plaintiffs have failed to establish a significant disparate impact resulting from Sears' promotion practices. Accordingly, the fact that those promotion practices are highly subjective does not render them illegal under Title VII.

## (D) Training

▪ Sears offers many different types of training programs, both at the local and at the territorial level. The Sears Extension Institute (SEI) courses are locally-conducted self-improvement courses which are available upon request to all employees. These courses cover a variety of subjects, and are not required for hiring or promotion. In contrast, the technical training courses are open only to eligible employees, i. e., service technicians, mechanics, and others in similar technical service positions. These courses are taught in Dallas, and the number of openings in these classes is limited because these classes are available to employees throughout the entire territory.

Plaintiffs contend that their Exhibit 32 reveals an underrepresentation of black employees in Sears' various training programs, and that this underrepresentation results in diminished opportunities for advancement for blacks. The first row in Exhibit 32 deals with percentages of blacks and whites who take SEI courses. It shows that 84 per cent of the employees taking such courses are white. As noted above, however, these courses are available to all employees upon request.[30] In addition, the availability of these courses is advertised throughout the Shreveport facilities in conspicuous places, such as in employee lounges and near time clocks. The court agrees with Dr. Levine's conclusion that the 16 per cent black representation in the SEI courses simply represents the percentage of blacks who are *interested* in taking those courses.

---

he would expect the same percentages of blacks in each job category as in the work force as a whole. For example, for 1980, when 37.8 per cent of the Sears work force was black, Dr. Stottlemire would expect blacks to be represented in all job categories at approximately 37.8 per cent. This theory is based upon Dr. Stottlemire's unproven assumption regarding random distribution of qualifications, which the court has already rejected. The court also rejects this theory as being both unproven and unrealistic.

**30.** The evidence shows that during the early years of the pertinent period the approval of the Store Manager, J. H. Hutchison, was necessary before an employee could enroll in a training course. In recent years either the Store Manager or the Personnel Manager can approve training requests.

Ms. Wilkins alleged that Hutchison often refused to approve black employees' requests for training. However, the court accepts Hutchison's denial of this allegation. No other evidence indicated that training requests are ever denied; in fact, Ms. Render testified that training requests are granted as a matter of course. The court finds that SEI courses are available upon request.

Exhibit 32's second row reflects the percentages of black and white employees who have taken the technical training course in Dallas. The court accepts Dr. Levine's testimony that, when one compares the actual numbers of those who took the course with those who were eligible to take the course, there is no statistically significant disparity between the percentage of eligible whites who took the course and the percentage of eligible blacks who took the course.

The third row of Exhibit 32 shows the percentages of black and white employees who took the division manager training course. Ms. Render's testimony established that this is a 13–14 week course taught in the Southern Avenue store by the staff. Like any SEI course, it is open to anyone who wishes to take it. Thus, like the SEI course data contained in this Exhibit, the 18 per cent black employees who took this course represents those who were interested in taking the course.

Finally, the fourth row of Exhibit 32 deals with the technical service schools. Again, as with the second row, Dr. Levine testified that a comparison of the percentage of eligible blacks who took the course with the percentage of eligible whites who took the course demonstrates no significant disparity.

Plaintiffs failed to prove the extent, if any, to which the completion of training courses affects one's opportunities for promotion. As Sears noted in its pretrial memorandum, this situation is unlike that in *James v. Stockham Valves, supra,* in which job progressions were dependent upon testing and training programs. Nevertheless, even assuming *arguendo* that completion of Sears' training courses enhances one's opportunity for advancement, Exhibit 32 in no way proves that blacks are underrepresented in these courses. Sears cannot be faulted if a relatively low percentage of black employees are interested in taking SEI courses. In addition, when the "eligibility pool" is taken into account in regard to the technical training courses and the technical service schools, it is clear that blacks are not in fact underrepresented.[31]

(E) Compensation

Plaintiffs contend that· Sears' hiring, job assignment and promotion practices and policies have resulted in a disparate impact upon the compensation which black employees earn at Sears. To bolster this contention, plaintiffs submitted the following exhibits: Exhibits 58–71, which deal with average rates of pay and W2 earnings for the Sears work force in general; Exhibits 72 and 73, which concern average rates of pay and W2 earnings for Sears' sales persons; and Exhibits 74 and 75, which set out the average rates of pay and W2 earnings for Sears' division managers.

The methodology utilized in the preparation of these exhibits indicates their unreliability as evidence of disparities in compensation. The greatest flaw is the inclusion of all job categories in determining average rates of pay and average W2 earnings. Dr. Stottlemire testified that he deliberately aggregated the entire work force in these exhibits in order to take into consideration all elements of employment decisions which affect compensation, *i. e.,* job placement, promotion, etc. The Fifth Circuit has recognized the relevance of average compensation exhibits in at least three cases: *James v. Stockham Valves, supra,* 559 F.2d at 329; *Watkins v. Scott Paper Co.,* 530 F.2d 1159, 1165 (5th Cir. 1976), *cert. denied,* 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976); and *Baxter v. Savannah Sugar Ref. Corp.,* 495 F.2d 437 (5th Cir. 1974), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974).

31. Dr. Stottlemire testified on rebuttal that the conclusions regarding the technical service schools and the technical training courses would be affected if entrance into the eligibility pool were not racially neutral. However, the court has already determined that plaintiffs have failed to establish the existence of any discrimination in hiring, job assignment, or promotions. Thus, if entry into the eligibility pool is not racially neutral, plaintiffs have failed to establish that fact.

However, the average pay exhibits in this case are more suspect than those in *James, Watkins* or *Baxter* because the Shreveport Sears facilities encompass a much greater range of job categories than did the manufacturing plants in those cases. It is true that Sears' Shreveport work force, like the manufacturing plants in those cases, includes laborers and craft workers. Nevertheless, as mentioned previously, the backbone of Sears' retail merchandising business is its sales force, which constitutes its single largest job category and includes a great variety of types of sales positions. An entry-level service technician or mechanic may well be compensated at a higher rate of pay than an entry-level sales person, though the applicants for those positions are not in competition. Thus, if a black applicant seeks and receives an entry-level sales position while a white applicant requests and obtains an entry-level service technician position, the fact that the white employee starts out at a higher rate of pay than the black employee is a function of the different types of jobs, not of discrimination.

A more important distinction between this case and *James, Watkins* and *Baxter* is that the Fifth Circuit in those cases relied upon the disparities in average compensation as evidence of discriminatory job assignment and/or promotion practices. In this case, this court has already determined that plaintiffs have failed to prove a *prima facie* case of discrimination in either job assignments or promotions. The apparent disparities in plaintiffs' compensation exhibits do not support their allegations of discriminatory job assignment and promotion practices because, as will be discussed *infra*, the accuracy and probative value of the exhibits are questionable.

In the recent case of *Vuyanich v. Republic National Bank*, 24 F.E.P. 128 (N.D.Tex. 1980), the court noted that, "Not surprisingly, where an employer has employees in differing occupations and of different backgrounds, a simple comparison of the average wage of all white employees and all black employees ... will not be enough to prove salary discrimination." *Id.* at 170–71

(citation omitted). Sears' work force, like that of the Republic National Bank's in *Vuyanich*, clearly encompasses many different "occupations". For these reasons, this court finds that plaintiffs' compensation exhibits are insufficient evidence that Sears' employment practices result in a disparate impact upon black employees' rates of pay or total wages.

In addition to the fact that plaintiffs' methodology of using average pay comparisons is suspect, the figures contained in the compensation exhibits are of doubtful accuracy. Exhibit 58 shows 146 black employees with experience of one year or less. Dr. Stottlemire testified that he would expect the "one year or less" column for 1974 in Exhibit 58 to contain those employees who were hired in 1974. However, plaintiffs' Exhibit 42A shows 116 black hires in 1974. In fact, in *every* instance, the "one year or less" columns contain more individuals than the actual number of hires in a given year as reflected in Exhibits 42A–F. Dr. Stottlemire explained that the disparities were probably caused through use of different mathematical formulas for obtaining the information contained in Exhibits 42A–F and Exhibits 58 *et seq.* following, but he admitted that the figures in the "one year or less" column are erroneous. Nevertheless, he contended that the erroneous information would not affect the reliability of the exhibits unless there is some "nonrandom factor" involving the individuals who appear on Exhibits 58 *et seq.*, but not on Exhibits 42A–F. Dr. Stottlemire's jargon concerning randomness does not change the fact that the information contained in Exhibits 58 and following in the "one year or less" columns is wrong.

Another problem with plaintiffs' compensation exhibits lies in the use of the "more than five years" experience columns contained in the exhibits. Dr. Stottlemire admitted that he was "concerned" about using this "collapsing data", but used it anyway because he could not extend the chart *ad infinitum* to cover the 20 to 30 years that some employees have been employed at Sears. As Dr. Levine noted, no matter

what the reason for using this category it is much too large to allow useful comparisons and includes a considerable number of long-term white employees, many of whom were hired prior to the effective date of Title VII.

Plaintiffs' Exhibits 72 and 73, which concern average rates of pay and average W2 earnings for sales persons only, fail to distinguish between "big ticket" sales persons and other sales persons. Big ticket sales persons are basically commission sales persons. The classification derives its name from the fact that most of the sales persons sell the relatively larger or more expensive items handled by Sears. Clearly, the amount of money which a commission sales person is able to earn is only marginally controlled by Sears. This court accepts Ms. Render's testimony that, when one separates the big ticket sales persons from the other sales persons represented in Exhibits 72 and 73, the consistent disparities between black and white sales persons disappears.

On rebuttal, Dr. Stottlemire criticized the separation of big ticket sales persons from other sales persons, stating that the disparities between the earnings of black and white big ticket sales persons indicates that blacks are given "less lucrative" big ticket sales positions. On cross examination, Dr. Stottlemire admitted that experience and longevity may determine to a large extent the amount of money a big ticket sales person can earn, especially through repeated contact with regular customers. Dr. Levine's data reveals that, during the pertinent period, approximately the same percentage of blacks moved into big ticket sales positions as are present overall in the Sears sales force. Thus, if blacks have been moving into big ticket sales positions in recent years, their relatively shorter length of experience unquestionably would determine in part why they earn less than their white counterparts.

Dr. Stottlemire also testified on rebuttal that, following his testimony on direct, he ran a computer program to determine whether disparities in compensation were still evident after big ticket sales persons were separated from other sales persons. He testified that the 125-page printout resulting from this program demonstrated that the disparities between black and white sales persons remained even after big ticket sales persons were separated out. This printout was not introduced into evidence, nor was it read into the record. The court has no reason to question Dr. Stottlemire's credibility, but under the circumstances the court accepts Ms. Render's testimony on this point, as mentioned previously.

Finally, Exhibits 74 and 75 allegedly reveal the disparities in pay between black and white division managers. Despite the small numbers of division managers appearing on these exhibits, neither Dr. Stottlemire nor plaintiffs made any attempt to compare the work records of the individuals who appear on these exhibits. Plaintiffs also ignored the fact that there are different grades of division managers at Sears, who receive a base rate and a "grade override" which determines their amount of compensation.

Ms. Render determined that the two individuals who initially appear under the "1–2 years" experience column in Exhibits 74 and 75 are Herb Patton, a black employee, and Robert McCullough, a white employee. Patton was Division Manager of Department 4, while McCullough was in charge of Division 400. Throughout the period covered by the exhibits, Division 400 was much more profitable than Division 4, which increased McCullough's compensation because of the "grade override" factor. For example, in 1977, Division 4 grossed about $285,000, but Division 400 made over $1 million. It should be noted that in 1977, Patton's base compensation rate was $5.90 per hour, while McCullough's was $5.00 per hour. Thus, it is clear that the disparity between Patton's and McCullough's compensation was solely a function of the department over which each individual worked.

For all of the foregoing reasons, the court finds that the methodology and the questionable accuracy of plaintiffs' compensa-

tion exhibits render them insufficient evidence to support plaintiffs' allegations of discrimination in compensation. The court agrees with Dr. Levine's assessment that comparing "raw" pay information is not a valid statistical method of determining pay differentials when one *knows* that blacks are distributed throughout the Sears work force differently than whites and when the differing distributions between black and white employees have not been proved to have resulted from racial discrimination.

(F) Testing

Sears administers several employment tests to its employees, the results of which are one factor in hiring and promotion decisions. These tests include the "Sears Test of Mental Alertness" (STMA), the "Sears Clerical Test" (SCT) and the "Sears Arithmetic Skills Test" (SAST). The STMA, the SCT and the SAST supposedly measure an applicant's or employee's "aptitude and ability". The "Thurstone Temperament Schedule" (TTS) is intended to measure personality. Finally, Sears administers certain knowledge and skill tests to applicants for skilled positions, such as the "Mechanical Aptitude Schedule" and the "Mechanical Knowledge Inventory".[32] From among these available tests, Sears administers different combinations to different employees, depending upon the position into which the employee is hired. For example, sales persons are given the TTS and STMA tests, as are division managers. General clerical employees are given the STMA, SCT and SAST tests. An employee who works with electronics must take the STMA and Mechanical Aptitude Schedule tests.

Plaintiffs contend that the use of these tests is unlawful because the tests result in a disparate impact upon black applicants for hire and for promotion. They also argue that the tests have not been validated by any study which shows that the tests are "appropriate for the selection of qualified applicants for the job in question." *Washington v. Davis*, 426 U.S. 229, 247, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976). In support of this contention, plaintiffs introduced the expert testimony of Dr. Richard Flicker, who was accepted by the court as an expert in test validation methods and procedures, employee testing, and industrial psychology. Dr. Flicker was of the opinion that the Sears employment tests, for the most part, are not at all job-related. Sears' expert witness on this subject, Vernon J. Bentz, whom the court accepted as an expert in employment and psychological testing, was of the opinion that the Sears employment tests are in fact job-related.[33]

However, this court need not resolve the question whether Sears' employment tests are job-related or have been validated. Title VII does not prohibit the use of "professionally developed ability test[s]" so long as neither the tests themselves, their administration, nor any action taken upon their results is "designed, intended, or used to discriminate because of race, color, religion, sex, or national origin."

---

32. A complete listing of the various tests administered by Sears appears in Section F(14) of the Pretrial Order:

The following tests are used by Sears and were initiated on the dates indicated:

(a) Sears Test of Mental Alertness – 1968

(b) Thurstone Temperament Schedule – 1952

(c) Sears Clerical Test – 1968

(d) Sears Arithmetic Skills Test – 1968

(e) Mechanical Aptitude Series

 Paper Puzzles – 1963
 Visual Pursuit – 1963
 Bolts – 1963

(f) Job Knowledge Tests

 Electronic and Television Job Knowledge Tests – 1960, revised in 1970

 Mechanical Service Job Knowledge Job Tests – 1963, revised in 1979

 Mechanical Knowledge – Tune-Up – 1967, revised in 1977

 Mechanical Knowledge – Wheel Brake – 1967, revised in 1977

 Mechanical Knowledge – Front End – 1967, revised in 1977

33. It should be noted that Mr. Bentz is a Sears employee, and has served as Director of Psychological Research and Services at Sears for 31 years.

42 U.S.C. § 2000e–2(h). In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court held that an employer need not prove that its tests are job-related until the complaining party first shows that "the tests in question *select* applicants for hire [or promotion] ... in a racial pattern significantly different from that of the pool of applicants." 422 U.S. at 425, 95 S.Ct. at 2375 (emphasis added). As one commentator has noted, "the law does not require that *all* employment tests must predict performance accurately; the burden of justification arises only when a test disadvantages minorities relative to whites." Fallon, *To Each According to His Ability, From None According to His Race: The Concept of Merit in the Law of Antidiscrimination*, 60 Boston L.Rev. 815, 848 (1980) (emphasis added). This court has already determined that plaintiffs failed to prove that Sears' hiring and promotion practices have a discriminatory impact upon blacks. In addition, Sears' employment tests, unlike those in the *Griggs* and *Albemarle Paper Co.* cases, do not *select* applicants for hire or promotion, inasmuch as there are no pass/fail cutoff. scores, and the tests are used as only one factor in hiring and promotion decisions.[34] In the absence of any showing that Sears' employment tests disparately affect black applicants for hire or promotion, and indeed in the absence of any evidence that the tests "select" any applicants at all, the burden never shifted to Sears to prove job-relatedness.

(G) Terminations

■ Plaintiffs' final contention is that Sears discriminates against blacks in layoffs and firings. No credible evidence was introduced at trial that Sears' layoff, or "reduction in force", policy is discriminatory. These decisions are based on seniority alone. This court need only consider plaintiffs' contention that Sears' fires a disproportionate number of black employees.

Ms. Render's testimony established that "company initiated" terminations may take place for a number of objective or subjective reasons. If a black employee is fired for an objective reason, such as tardiness, issuing bad checks, or misappropriating company property, there can be no reasonable argument that the termination was based upon racial considerations. However, Sears often fires employees for subjective reasons, such as "unsatisfactory group adjustment", "unsatisfactory quantitative work performance", or "unsatisfactory qualitative work performance". Evidence that a disproportionate number of blacks were fired for such subjective reasons would give rise to an inference of discrimination.

Dr. Levine broke down the numbers of blacks and whites fired for subjective reasons within the seven EEO categories as follows:

SUBJECTIVE TERMINATIONS 1974 – 1979

| EEO Categories | No. Blacks | No. Whites |
| --- | --- | --- |
| Officials and managers | 0 | 3 |
| Sales | 0 | 7 |
| Clerical | 6 | 1 |
| Craftsmen | 5 | 7 |
| Operatives | 0 | 4 |
| Laborers | 10 | 5 |
| Service | 6 | 1 |

In examining this chart, one finds that when the laborers and service categories are combined, 16 blacks out of 22 total employees were fired, or 72.7 per cent. In the remaining categories, 11 blacks out of 22 total employees were fired, or 50 per

**34.** The testimony of Sears' witnesses, in addition to the pertinent information contained in the affirmative action binders, conclusively establishes that the employment tests do not incorporate any pass/fail cutoff scores. The only evidence submitted by plaintiffs to rebut this fact was the testimony of Dr. Flicker. Dr. Flicker felt that personnel interviewers are given conflicting indications of how test results are to be used, in that they are told that there are no cutoffs, yet are also told that they should be able to justify the hiring of any person who scores poorly on the tests. On this point, the court was impressed with the testimony of Joyce Deal, a black personnel interviewer, who stated that there were no cutoffs. The court gives greater weight to the testimony of an experienced personnel interviewer who actually administered employment tests than to the "impressions" of an expert who has no such experience and who did not interview anyone with such experience.

cent. The court accepts Dr. Levine's testimony that the proportion of black laborers and service employees fired during this period approximates the representation of blacks in those job categories from 1974 to 1979. In addition, though the 50 per cent proportion of blacks fired from the other categories exceeds their representation in those categories, the small numbers involved and the fact that the difference does not rise to the level of a "gross disparity" convince the court that the available data does not support an inference of discrimination in terminations. Although Dr. Levine's breakdown of the data supplied him by Ms. Render may not affirmatively *disprove* plaintiffs' allegations of discrimination in terminations, it effectively rebuts the allegations of discrimination in terminations by showing that the "apparent disparity" in Plaintiff's Exhibit 76 "is not the real one." *Rowe v. General Motors, supra,* 457 F.2d at 358.

### IV. *THE DISPARATE IMPACT CLAIMS—CONCLUSION*

The Fifth Circuit has recently observed that a district court, in assessing statistical presentations in Title VII class actions, should "accept what figures are available; allow for imperfections, skewing factors, and margins of error; and then take the figures for what they are worth. Sometimes this is much, sometimes little." *Phillips v. Joint Legislative Comm., supra,* at p. 1025. This court has accepted and considered all exhibits. Allowing for imperfections, the court finds no conclusive evidence in these exhibits that Sears' employment practices have resulted in disparate impact upon blacks. Rather, the court finds that the Affirmative Action Program has facilitated great progress for black employees at Sears.

 In their pretrial memorandum, plaintiffs argued that "a showing of adoption or implementation of an affirmative action program does not affect liability for earlier discrimination", *citing Williams v. DeKalb County,* 577 F.2d 248 (5th Cir. 1978), *modified,* 582 F.2d 2 (5th Cir. 1978).

In *Williams,* the Fifth Circuit stated that "a *subsequently* adopted [affirmative action] program, no matter how laudatory, is wholly irrelevant to the issue of discrimination vel non at an earlier date." *Id.* at 256 (emphasis added). Though plaintiffs' argument is correct, it is inapplicable to the facts of this case. The pertinent time period in this lawsuit stretches from December 22, 1972 through the present. Obviously, Sears' Affirmative Action Plan, instituted in 1968, was not "subsequently adopted", but was in effect well in advance of the pertinent time period. The court recognizes that an employer may not escape liability for employment discrimination merely because of the existence of an Affirmative Action Program. However, the existence of an Affirmative Action Program that *works* is certainly relevant evidence that would tend to rebut allegations of unlawful employment discrimination. In this case, the evidence indicates that Sears' Affirmative Action Program does indeed work. Plaintiffs' failure to prove their disparate impact claims requires the court to deny their requests for injunctive and declaratory relief, and to dismiss those claims on the merits.

### V. *PLAINTIFFS' ALLEGATIONS OF DISPARATE TREATMENT*

In addition to their statistical evidence, plaintiffs presented the testimony of several class members who alleged that they were victims of or knew about instances of Sears' disparate treatment of blacks. Included among these allegations were the individual Title VII claims of one of the named plaintiffs, Samuel Carroll. The Supreme Court recognized in *International Brotherhood of Teamsters* that evidence of disparate treatment may convincingly substantiate plaintiffs' statistical proof:

> [T]his was not a case in which the government relied on "statistics alone." The individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life.

431 U.S. at 339, 97 S.Ct. at 1856. *Schlei and Grossman* have observed that "as the statistical disparities become smaller and the statistical disparities become smaller and the statistical conclusions more in conflict, the necessity of convincing nonstatistical proof becomes more essential for plaintiffs. Instances of 'disparate treatment' can be very helpful, as well as the testimony of individual employees concerning their plight or mistreatment." *Schlei and Grossman, supra*, at 329 (supp. 1979). This court has already discussed plaintiffs' unconvincing statistical presentation. Plaintiffs' nonstatistical proof was similarly unconvincing. The individual claims of Samuel Carroll and the testimony of each class member who testified during plaintiffs' case in chief will be discussed separately.

### (A) Samuel Carroll's Individual Claims

#### (1) Burden of Proof—Disparate Treatment

" 'Disparate treatment' such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *International Brotherhood of Teamsters, supra*, 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854 n. 15. The landmark case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), sets forth the burden of proof governing an individual's claim of disparate treatment. The plaintiff must initially establish a *prima facie* case. If plaintiff successfully establishes a *prima facie* case, the defendant may rebut that showing by articulating a legitimate, nondiscriminatory explanation for its actions. *Id.; Furnco Construction Co. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 50 L.Ed.2d 216 (1978); *Texas Dept. of Community Affairs v. Burdine*, —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Finally, if defendant articulates a legitimate reason for its actions, plaintiff must show that defendant's articulated reason is a mere pretext which masks unlawful discrimination. *McDonnell Douglas, supra*, 411 U.S. at 804, 93 S.Ct. at 1825. In addition, in any disparate treatment case, "[p]roof of discriminatory motive is critical...." *International Brotherhood of Teamsters, supra*.

#### (2) Samuel Carroll's Allegations

In November of 1971, Carroll was hired as a part-time truck helper, though he had requested full-time employment. Carroll contends that Sears' failure to hire him as a full-time employee was an act of discrimination in hiring based upon his race. This conclusory allegation is not supported by a shred of evidence.

In *McDonnell Douglas*, the Supreme Court held that a plaintiff may establish a *prima facie* case of discrimination in hiring by showing (1) that he is a member of a protected class; (2) that he "applied and was qualified for a job *for which the employer was seeking applicants*"; (3) that he was rejected for that position despite his qualifications; and (4) that, after he was rejected, "*the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.*" 411 U.S. at 802, 93 S.Ct. at 1824 (emphasis added). Though Carroll is unquestionably a member of a protected class, and he was presumably qualified for a full-time position inasmuch as he was hired part-time, there is absolutely no evidence that Sears was seeking applicants for a full-time position or that they continued to seek applicants after hiring Carroll part-time. Carroll admitted on direct examination that Sears' stated reason for hiring him part-time rather than full-time was that no full-time positions were then available. He produced no evidence whatsoever to show that any full-time vacancies in fact existed at the time he applied for work or during the period in which his application was active.

The Fifth Circuit recently ruled in *Phillips v. Joint Legislative Comm., supra*, that "a vacancy within the meaning of the *McDonnell Douglas* test does not mean only an opening existing at the precise date of application, but any opening during the

time that the application remains active." at 1029 n. 34. The record shows that Carroll applied for employment on November 22, 1971, and was hired the next day. His application remained "active" only one day. Carroll's testimony that Sears informed him that no full-time positions were available is the *only* pertinent evidence concerning vacancies [35] in the record, and his mere suspicion and belief that his being hired part-time was discriminatory is insufficient evidence to prove his Title VII claim. *Long v. Sapp*, 502 F.2d 34, 37 (5th Cir. 1974).

Carroll also claims that, despite his persistent requests to be promoted to a full-time position, Sears never promoted him. The elements of a *prima facie* case of discrimination in promotion are identical to those mentioned above concerning discrimination and hiring, except that the "job for which the employer was seeking applicants" refers to an upper-level position into which one is promoted, rather than an entry-level position. *Danner v. U. S. Civil Service Comm.*, 635 F.2d 427 (5th Cir. 1981). Again, Carroll is obviously a member of a protected class, and although he introduced little evidence at trial concerning his qualifications for promotion, the court is willing to assume that he was qualified at least for promotion to a full-time truck helper position. Carroll's proof was also scanty concerning the availability of promotional opportunities during the period when he was seeking promotion, but the court is also willing to assume that promotional opportunities were available during the period. However, the court accepts Sears' articulated non-discriminatory reason for failing to promote Carroll: that he was an undependable worker with an irascible temperament.

There was conflicting testimony concerning Carroll's work habits and temperament. Ms. Wilkins testified that Carroll was an "ambitious, qualified worker", and that Robert Lowrey, Sears' warehouse manager, never gave her any reasons why he considered Carroll to be a "troublemaker".

Carroll claimed that his troublemaker reputation was based solely on his frequent requests for promotion. On this point, the court accepts the testimony of Lowrey and Lloyd Rochelle, a black Sears employee and Carroll's immediate supervisor at the warehouse. Lowrey testified that the warehouse had a heavy workload and that he depended on Carroll, but could not count on him. Rochelle remembered Carroll as a "mean guy who said anything that came to his mind", and who cursed frequently on the job. Despite Carroll's conclusory allegation that Sears failed to promote him because of his race, the testimony of Lowrey and Rochelle supports a finding that Carroll was not denied promotion because of his race, but because of his undependability and his temperament. Carroll introduced no credible evidence to show that Sears' articulated non-discriminatory reason for failing to promote him was pretextual.

Carroll's final claim is that his termination was racially motivated. In *Thompson v. Leland Police Department*, 633 F.2d 1111 (5th Cir. 1980), the Fifth Circuit Court of Appeals cited *McDonnell Douglas* and set forth the elements of a plaintiff's burden of proof to establish a *prima facie* case of discriminatory discharge:

(1) he is a member of a protected class; (2) he was discharged; (3) the discharge was not for a valid reason; and (4) the defendant sought applicants for the vacant position.

633 F.2d at 1114. This court finds that Carroll failed to establish a *prima facie* case in discrimination in firing, because his own testimony, both on direct and on cross-examination, and the documentary evidence concerning his termination, convince the court that the discharge was in fact for a valid reason. The circumstances surrounding Carroll's termination also support, in part, the court's earlier finding concerning his irascible temperament.

The court resolves the conflicting testimony concerning Carroll's termination by

---

**35.** Plaintiffs contend in their post-trial brief that the Sears Affirmative Action Manuals for 1972 and 1973 (Defendant's Exhibits 11 and 12) reveal that white applicants were hired full-time into the operatives category while Carroll was hired part-time. However, this data covers a broad time period and does not show that any full-time openings were available *at the time Carroll applied or during the period his application was active.*

finding that the following sequence of events took place. Carroll's work week ordinarily stretched from Tuesday to Saturday, with Sunday and Monday off. During Carroll's final work week before his termination, on the last Friday in April, 1973, he was informed that he would be expected to work on the following Monday. After Rochelle refused to give Carroll permission to take that Monday off, and advised him to speak with Ms. Wilkins about the matter, Carroll received permission from Ms. Wilkins to take the day off *conditioned upon* his clearing the matter with Lowrey.[36] Contrary to a statement made in plaintiffs' pretrial memorandum, Carroll sought permission to take Monday off because he "might" see a doctor, *not* because he had a "preexisting doctor's appointment" for that day.

After returning to the warehouse from Ms. Wilkins' office, Carroll told Rochelle that Ms. Wilkins had given him permission to take Monday off. However, Carroll never secured Lowrey's approval,[37] and failed to report for work on Monday. Lowrey informed Ms. Wilkins that Carroll had not reported for work, whereupon Ms. Wilkins called Carroll to find out the reason for his absence. Carroll became belligerent, and told Ms. Wilkins that he would not "beg" anyone to let him off. At one point in the exchange, Carroll ordered Ms. Wilkins to "shut up." Ms. Wilkins wanted "backup", so she asked Vic Parrish, the Sears Operating Superintendent, to speak with Carroll. Carroll addressed Parrish in the same belligerent manner. Parrish, Wilkins, Lowrey and Rochelle all agreed that Carroll should be terminated for insubordination, and he was terminated effective May 1, 1973. Again, despite Carroll's contrary naked allegations, there is no proof that Carroll was terminated for any reason other than insubordination. Furthermore, there is no evidence to support a finding that a white employee who was belligerent toward the Operating Superintendent and the Personnel Manager, and who told the Personnel Manager to "shut up", would not have been terminated for insubordination. Carroll offered no credible evidence that his termination was pretextual in the least.

For these reasons, the court concludes that Samuel Carroll has failed to carry his burden of proving his allegations that Sears discriminated against him by hiring him into a part-time position, by failing to promote him, or by terminating him.[38] Accordingly, Carroll's individual Title VII claims are dismissed on the merits.

**(B) Class Members' Allegations of Disparate Treatment**

**(1) Samuel Carroll**

In addition to the allegations of his individual Title VII claims, Carroll leveled fur-

---

**36.** The issue whether Ms. Wilkins personally gave Carroll permission to take Monday off, or whether her permission was conditioned upon Lowrey's approval, was highly contested. However, during Ms. Wilkins' cross-examination, she admitted that *only* Lowrey, as Carroll's ultimate superior in the warehouse, had the final authority to give Carroll the day off. Accordingly, the court must find that Ms. Wilkins' permission was conditional pending Lowrey's approval.

**37.** Carroll testified on redirect that Ms. Wilkins told him only to "tell" Lowrey that he, Carroll, would be taking Monday off. Carroll further stated that he could not "tell" Lowrey on that Friday because Lowrey "drove off" in a vehicle. This story undermines Carroll's credibility. As mentioned previously, Saturday was a regular work day for Carroll. However, Carroll offered no reason why he did not "tell" Lowrey on Saturday about his conversation with Ms. Wilkins. Carroll's excuse that Lowrey "drove off" on Friday before Carroll could "tell" him, is simply specious.

**38.** The court acknowledges that statistical evidence of a disparate impact against a protected class, of which plaintiff is a member, may often aid a plaintiff's claims of disparate treatment. However, even when considering statistical evidence in conjunction with a disparate treatment action, the court must consider the facts and circumstances of the case and the probative value of the statistical evidence. *See Thompson v. Leland Police Depart., supra,* 633 F.2d at 1114. In this case, the evidence regarding the facts and circumstances of this case indicates to the court that no discriminatory treatment against Samuel Carroll in fact took place. Thus, plaintiffs' statistical presentation would be of no aid to Carroll, even if the court had found the statistical evidence convincing.

ther accusations of racial discrimination at Sears. Carroll alleged that many whites were promoted to full-time during the period when he was requesting promotion, and that several whites were hired into full-time positions during the same period. However, the court has already found that Sears' failure to promote Carroll was based upon his undependability and his temperament. Thus, the fact that whites were hired or promoted into full-time positions while Carroll was requesting promotion is irrelevant.

Carroll also alleged that black warehouse supervisors supervised only black employees. This allegation is totally refuted by the testimony of Rochelle and Lowrey. Rochelle, a black supervisor, evidently had few white truck helpers under his supervision at any given time. Lowrey recalled that Rochelle did not have any whites under his permanent supervision until 1975 when Bernard Crawford, a white employee, was hired as a truck helper. However, before Crawford was hired, Rochelle supervised white employees who were placed in his area on temporary assignment. In view of the fact that Carroll worked in the warehouse from November 1971 until May 1, 1973, it is possible that Rochelle *in fact* supervised only blacks *during that period*. Even if this were so, the court draws no inference of discrimination from such a fact. The clear import of the totality of the evidence is that Lloyd Rochelle supervised everyone, whether black or white, who was hired or placed into a job code under his dominion.

Finally, Carroll contended that he did not know about the training opportunities that are available at Sears because no notices were posted and no one told him about the training programs. On this point, the court accepts the testimony of Ms. Wilkins, Ms. Render, Mr. Hutchinson and others who stated that notices about Sears' training programs have always been posted in conspicuous places at the Sears facilities, such as in the employees' lounge or in the vicinity of the time clock. If Carroll did not know about Sears' training opportunities, it was because he did not look at the notices.

### (2) Charles W. Grant [39]

Grant first applied for employment at Sears in August of 1971, requesting a position as a truck helper. Although Grant's employment application indicates that he sought both part-time and full-time work, the court accepts Grant's testimony that he actually desired full-time work, but was informed that he should request part-time work as well because no full-time positions were available. Shortly thereafter, Grant was hired as a part-time truck helper.

Like Carroll, Grant "constantly" requested upgrading to full-time status. Unlike Carroll, however, Grant ultimately was promoted to full-time truck helper. Grant's allegation that his promotion to full-time status resulted in major part from an investigation into Carroll's termination is conjectural and is unsupported by the record.

In support of his allegation that Sears engaged in discriminatory promotion practices, Grant testified that a white male was hired or transferred into a full-time position as a T. V. Room "deluxer" during the period Grant was seeking a promotion to full-time. Grant also cites the case of a white female who was hired as a full-time truck driver during the same period. The evidence shows that James Wyatt was the white male who was transferred into the deluxer position. Significantly, Wyatt was hired in 1969 and had more seniority than Grant. Furthermore, Wyatt had occupied another full-time position at Sears prior to his transfer to the deluxer job. In regard to the hiring of the white female truck driver, Sissy Barnes, there is no evidence other than Grant's naked allegations that the failure to promote Grant into that truck driver position was based upon his race. Though Grant's work habits and tempera-

---

**39.** Though Grant is a named plaintiff in this action in his capacity as a class representative, he was unable to prosecute any individual claims under Title VII because of his failure to file a charge with the Equal Employment Opportunity Commission.

·ment do not appear as undesirable as those of Samuel Carroll, Ms. Wilkins, who otherwise considered Grant to be an acceptable employee, admitted that he was a "slow" worker.

During a large-scale reduction in force in 1975, Grant was laid off. In his testimony, Grant alleged that the aforementioned white employees, Wyatt and Barnes, should have been laid off at the same time but were not. However, there is no question that lay-offs at Sears are based solely on seniority. As mentioned above, Wyatt's employment date predated Grant's, which explains why Wyatt was not laid off at the same time as Grant. In addition, Ms. Render's testimony established that Barnes was, in fact, laid off on the same day as Grant.

It is Sears' policy to give priority in rehiring to former employees who have been laid off. Grant contends that Sears discriminated against him by failing to rehire him after he reapplied for work. The court resolves the conflicting evidence on this point by finding that Grant was not "rehirable" because he failed to comply with Sears' policy that all applicants for employment must pass a certified physical examination conducted by a company physician. Though Grant's personnel file reveals that a Dr. Sigler at the Confederate Memorial Hospital (now LSU Medical Center) released Grant to return to work, there is no dispute that Dr. Sigler was not an authorized company physician.

Grant's final allegation was that he was never aware of training opportunities, and more specifically that he had never heard of Sears Extension Institute courses. Again, the court notes that Sears publicized its training opportunities by posting notices in conspicuous places throughout its Shreveport facilities. Grant had only to read the notices in order to become aware of the opportunities.

### (3) Marlene Washington

Ms. Washington initially worked at Sears from July until December of 1974 as a part-time telephone solicitor. She was laid off in a December 1974 reduction in force, and admits that this lay-off was by no means discriminatory.

Several years later, she reapplied for work at Sears and was employed in March 1977. After working for a short time as a cashier, she received a transfer to the service department as a telephone dispatch employee. While working in the service department, Ms. Washington allegedly encountered several racially-oriented problems. A Sears employee from Dallas came to the Shreveport store to look into her accusations of racism.

William Burt, Ms. Washington's supervisor in the service department, testified that Ms. Washington was not a good employee and that she had a "big chip on her shoulder". Burt stated that the service technicians often complained about Ms. Washington's failure to supply correct addresses for service calls. In Burt's opinion, Ms. Washington was a very slow worker and was slow to learn. In this regard, it should be noted that Ms. Wilkins considered the ability to work quickly an essential trait for a telephone dispatch employee.

In conjunction with Ms. Washington's allegations of discrimination, the court accepts Burt's testimony that Ms. Washington is an extremely prejudiced individual. Burt stated that Ms. Washington construed even innocent statements made in the warehouse as being racially motivated. This factor undermines the weight which the court gives Ms. Washington's allegations.

Ms. Washington's two specific complaints of disparate treatment were totally refused by Ms. Render. First, Ms. Washington stated that a white female, Karen Craft, was given more 40-hour work weeks than Ms. Washington because Ms. Craft was "sharp", implying that the true reason was that Ms. Craft is white. However, Ms. Render established that Ms. Craft was given four 40-hour weeks during her employment from June to August of 1977. Ms. Washington had eight 40-hour weeks during her employment period. Ms. Render knew of the exact dates of only two of Ms. Craft's 40-hour

weeks (the weeks of July 23, 1977 and August 6, 1977) and Ms. Washington had 40-hour weeks on both occasions.

Second, Ms. Washington alleged that a white female, Cynthia Rashall, was not laid off at the same time as Ms. Washington despite the fact that Ms. Rashall had less seniority. While it is true that Ms. Rashall was terminated six days after Ms. Washington, a letter in Ms. Rashall's personnel file shows that she was terminated on the later date because her supervisor retained her for an extra week to fill in for an ill employee.

### (4) Doris White

After Ms. White applied for work at Sears on February 10, 1976, Sears hired her as a part-time porter in the warehouse area. Later, she was transferred to the position of service technician beginner. Her supervisors in the service area were C. L. Jenkins and Bob Hunt. As a part of her training to become a service technician, Ms. White took a service beginner course in Dallas. There is no question that her performance in Dallas was more than adequate.

Ms. White returned from the Dallas training course with "lessons" which she was to complete and return to Dallas. She evidently had a problem concentrating on her studies in the work area, so Jenkins placed her in the employees' lounge, a much quieter area, to study. This situation caused a morale problem in the service area: other employees complained to Jenkins when they found Ms. White sleeping in the lounge rather than studying, and resented the fact that Ms. White was sleeping on Sears' time while they were working. Jenkins' assistant, Hunt, was responsible for overseeing Ms. White's studies. Jenkins and Hunt had talks with Ms. White about her unsatisfactory study habits.

Compounding Ms. White's problems with her studies were the service technicians' complaints about Ms. White's presence on their service crews. The service technicians complained to Jenkins that Ms. White was uncoordinated, and that on one occasion she dropped an air conditioner on one of the technicians.

Based upon Ms. White's study habits, her performance on the service crews, and her lack of experience or "Vo-Tech" instruction, Jenkins and Hunt ultimately concluded that she would not make it as a service technician. Accordingly, about three months after her initial assignment as a service technician beginner, Ms. White was terminated by Ms. Wilkins. Ms. White asked Ms. Wilkins to transfer her to another position at Sears, but Ms. Wilkins stated that she did not have anything Ms. White could do. Given Ms. White's propensity for sleeping on the job, Sears' action in terminating Ms. White rather than transferring her to another position appears emminently reasonable.[40]

### (5) Earl Dixon

Dixon began work with Sears on April 21, 1972, as a part-time tire installer in the automotive department. At the time of trial, Dixon had been a full-time employee for Riley-Beaird in Shreveport for 13 years, and was hired part-time because he requested part-time work. During his testimony, Dixon claimed that he was laid off in April of 1978, about one month after he had requested training as an auto mechanic and promotion to a mechanic's position. He alleges that his layoff was a direct result of his request for training and promotion.

However, based upon Ms. Render's testimony, the court finds that Dixon was not laid off in April of 1978 as he claimed. The Sears payroll records show that Dixon was still carried as an employee after he ceased working in the automotive department.

---

**40.** The court rejects as incredible certain testimony by Ms. Wilkins which indicated that Jenkins and Hunt tried to persuade Ms. Wilkins to destroy Ms. White's favorable reports of her Dallas training and to substitute those reports with other, less favorable writeups. The court also rejects Ms. Wilkins' charge that Ms. White may actually have been terminated because the white female employees in the service area did not want a black employee in Ms. White's position.

Later, he began working in the Retail Distribution Center. He alleged that his position at the RDC entailed a cut in pay, but the "F–12" card contained in Dixon's personnel file shows that within two months of his transfer to the RDC he was making 45 cents per hour more than he had ever made as a tire installer.

Dixon also claimed that the white employees at the RDC were paid about 20 cents more per hour than the black employees. No evidence supports this bald allegation.

During his tenure at the RDC, Dixon was involved in union-organizing activities. He alleged that Sears curtailed his activities by transferring him to the "outlet" store, a position which he contends is less desirable and which is isolated from the other employees at the RDC. The testimony of Dwight Richards, the head supervisor at the RDC, totally refutes these allegations. Richards pointed out that all positions at the RDC, including those at the outlet store, are contained under one huge roof. The court accepts his testimony that no one position at the RDC is more or less desirable than any other, and that all positions afford equal interaction among employees because of common lounge and recreational facilities.

In October of 1979, Shreveport Police arrested Dixon and charged him with theft of Sears' merchandise. Several television sets had been discovered at Dixon's residence. Dixon was terminated on October 15, 1979, for having knowledge of the misappropriation of Sears' missing merchandise, *not* for theft. Three other RDC employees were fired at the same time: Kane, a black male; Simpson, a white male; and Allen, a white female. Though Dixon was ultimately acquitted of the charge of theft in a Louisiana state court, it should be noted that Kane, one of the employees terminated along with Dixon, was convicted. Dixon's complaint that Sears has failed to rehire him despite his acquittal is ludicrous.

One of Dixon's main complaints about Sears concerned his ignorance of training opportunities. Dixon flatly asserted that,

in his opinion, blacks are excluded from training courses. Again, the court notes that Dixon would have been well informed of the various training opportunities if he had taken the time to read any of the training notices posted throughout Sears' Shreveport facilities. In addition, the record shows that Dixon personally completed a basic training course under a Mr. Stevens in 1975, and that Dixon was aware of other blacks who took part in training courses.

(6) Evans Godwin

■ Sears hired Godwin as a full-time installation inspector in August of 1977. Godwin's current job title is "merchandise distributor". Godwin leveled several accusations of racially disparate treatment at Sears, centering on alleged disparities in compensation and upon an allegedly racially-hostile work environment.

During Godwin's testimony, on cross-examination, defense counsel pushed him to be more specific about his allegations of disparities in compensation. Godwin responded that a white employee, Chris Brown, was hired about one year after Godwin into a position lower than Godwin's, yet was paid only 5 to 10 cents less per hour. Ms. Render's testimony establishes that when Brown was hired May 9, 1978, at $2.95 per hour, Godwin was making $3.60 per hour. Godwin also alleged that two white employees, James Connally and George McCoy, were hired into the same job position as Godwin within the same time frame, yet were getting paid more per hour. The record shows that Godwin was hired in August of 1977 at $3.05 per hour, while Connally was hired in April of 1977 at $2.45 per hour and McCoy was hired in September of 1977 at $2.60 per hour. This evidence shows that Godwin's allegations of disparate compensation are totally specious.

On cross-examination, Godwin named several individuals who allegedly contributed to a racially-hostile work environment at the RDC. Godwin stated that Homer Bevers called a black Sears supervisor a "nigger" but was not reprimanded. Chuck Coch allegedly called a Sears employee a "nig-

ger" in the presence of the Sears supervisor, Ms. Oliver, who did nothing about it. Coch also allegedly told ethnic jokes, at least once in the presence of a supervisor. Finally, Godwin alleged that Paul Stryker, a Sears supervisor, listened to an ethnic joke told by a concession truck driver during a break.

However, neither Bevers nor Coch are Sears employees: they are outside contractors who perform mechanical repair work on certain vehicles at the RDC. According to Dwight Richards, Bevers and Coch do not work any set number of hours at the RDC, but come and go as they please. Coch is a full-time employee of the United States Post Office. More importantly, Dwight Richards stated in no uncertain terms that if he were made aware of any problems caused by Coch or Bevers he would take it upon himself to correct the situation. Godwin's credibility is questionable following his false accusations of disparities in compensation, and this court simply declines to accept his testimony that Sears supervisors were present when Coch or Bevers engaged in racial epithets.

Godwin's allegation about Paul Stryker listening to an ethnic joke is completely trivial. Though the court looks forward to the day when ethnic jokes are no longer a part of our social fiber, the court cannot regulate the activities in which a Sears supervisor engages during his time off. One is not necessarily a racist because he listens to an ethnic joke. Even if Stryker did listen to an ethnic joke, this is hardly proof that a racially-hostile work environment exists at the RDC.

Godwin made one final allegation relating to the treatment of blacks at Sears: that the furniture repair department is staffed entirely by white employees. This allegation, even if true, does not prove that Sears discriminates against black employees. Plaintiffs submitted no evidence on the number of employees in the furniture repair department, or of the skills that are necessary to work in that department. Without this information, it would be diffi-

cult, if not impossible, to judge whether an all-white furniture repair department would justify an inference of racial discrimination.

### (G) Evans Page Jr.

Page worked as a part-time tire installer from July 22, 1974, until he was laid off on October 26 of the same year. He was reemployed as a part-time tire installer in May of 1975, and promoted to full-time tire installer in September of 1975, a position he held until he voluntarily resigned in April of 1977.

Page's initial complaint is that he was hired as a tire installer despite the fact that he requested employment as a mechanic and had experience as a mechanic. However, the record shows that Page's employment application indicated only that he had worked as a service station *attendant*, not as a mechanic. Ms. Wilkins conceded that one who read Page's employment application could not presume that he had experience as a mechanic. Next, Page contends that he was promoted to full-time tire installer only after he complained to Ms. Wilkins that a white individual had been hired as a mechanic after Page had been seeking that position persistently. This conjecture is unsupported by any other evidence.

Page further alleges that the black mechanics at Sears were given less complex jobs than the white mechanics, resulting in lower pay for the blacks. Like Page's previous allegation, this contention is totally unsubstantiated. Finally, Page contends that Sears discriminates against blacks by failing to hire or promote qualified blacks into mechanic positions. Page acknowledged on cross-examination, however, that there have always been black mechanics at Sears, and plaintiffs' own exhibits reveal that during the pertinent period no fewer than 26.3 per cent of all mechanics at Sears were black.[41]

---

41. *See* Plaintiffs' Exhibits 43 through 48. The 1975 figures show that five of 19 mechanics, or 26.3 per cent, were black. The percentages in each ensuing year are higher for blacks. No percentages are given for 1974, indicating that no employees were classified as "mechanics" during that year.

## VI. CONCLUSION

After consideration and repeated reconsideration of the evidence and the arguments of counsel, the court finds that plaintiffs have failed to prove any classwide discrimination against blacks in hiring, job assignment, promotions, training, testing, compensation, or discharges. In addition, the court finds that plaintiffs' allegations of disparate treatment, including the individual Title VII claims of Samuel Carroll, are meritless. Accordingly, the court enters judgment in favor of Sears, Roebuck and Company against the class and against Samuel Carroll.

## APPENDIX A

### NUMBERS AND PERCENTAGES OF PART-TIME* AND FULL-TIME EMPLOYEES WHO ARE BLACK**

| | # Black PT | Total # PT | % Black PT | # Black FT | Total # FT | % Black FT |
|------|-----------|-----------|-----------|-----------|-----------|-----------|
| 1974 | 92 | 261 | 35.2 | 92 | 424 | 21.7 |
| 1975 | 102 | 245 | 41.6 | 93 | 405 | 23 |
| 1976 | 115 | 258 | 44.6 | 106 | 420 | 25.2 |
| 1977 | 130 | 318 | 40.9 | 145 | 483 | 30 |
| 1978 | 118 | 266 | 44.3 | 116 | 372 | 31.2 |
| 1979 | 111 | 242 | 45.9 | 117 | 353 | 33.1 |
| 1980 | 108 | 238 | 45.4 | 117 | 358 | 32.7 |

\* For purposes of this chart, the term "part-time" includes both part-time and part-time regular employees. The abbreviations "PT" and "FT" refer to part-time and full-time employees, respectively.

\*\* Source: Plaintiffs' Exhibit 49.